IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 18, 2018 Session

## STATE OF TENNESSEE v. CHRISTOPHER DESMOND SIMPSON

**Appeal from the Circuit Court for Lawrence County**
No. 32715    Stella L. Hargrove, Judge

_____

### No. M2017-01734-CCA-R3-CD

_____

The Defendant, Christopher Desmond Simpson, was convicted by a Lawrence County Circuit Court jury of second degree murder, a Class A felony. *See* T.C.A. § 39-13-210 (2018). The Defendant was sentenced to twenty-five years' incarceration. On appeal, he contends that (1) the trial court erred by denying his motion to suppress his pretrial statement, (2) the evidence is insufficient to support his conviction, (3) the trial court erred by denying his motion to sequester the jury, (4) the trial court erred by admitting autopsy photographs, (5) the trial court erred during jury instructions, and (6) the trial court erred during sentencing. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and JOHN EVERETT WILLIAMS, P.J., joined.

Robert L. Massey (at trial and on appeal), Pulaski, Tennessee, and Shara A. Flacy (at trial), Ardmore, Tennessee, for the appellant, Christopher Desmond Simpson.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Brent A. Cooper, District Attorney General, Christi Thompson and Gary Howell, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case arises from the June 21, 2014 killing of Michelle Robinson in a remote area of Lawrence County. The Defendant was arrested and indicted for first degree premeditated murder. The Defendant filed several pretrial motions, including a motion to suppress his police statement.

## Motion to Suppress Hearing

At the June 10, 2016 motion to suppress hearing, Tennessee Bureau of Investigation (TBI) Special Agent Nathan Neese testified that at the time of the incident he was employed by the Lawrence County Sherriff's Department and that he investigated this case. Agent Neese stated that on June 21, 2014, he reported to an area known as "The Bowl" after the victim was found lying by the road. Agent Neese said that The Bowl was a secluded area and that it was a common location for riding all-terrain vehicles (ATVs) and motorcycles. Agent Neese said that when he arrived, the victim had been taken from the scene by an ambulance, that he saw a lengthy blood trail, and that he saw a large pool of blood where the victim had been found. Agent Neese said that the Defendant sat in the backseat of a patrol car and that the Defendant was not wearing a shirt and was covered in blood.

Agent Neese testified that he and Lawrence County Sheriff's Investigator Amy Moore interviewed the Defendant at about 2:17 a.m. on June 22. Agent Neese stated that the Defendant was "probably a little sleepy." Agent Neese said that he introduced himself, that he told the Defendant why he wanted to speak with him, and that the Defendant appeared to understand.

Agent Neese testified that he read the Defendant his *Miranda* rights and that the Defendant signed a waiver of rights form, which was received as an exhibit. Agent Neese stated that the Defendant did not ask questions relative to his *Miranda* rights, that the Defendant wrote the date and time on the waiver form, and that the Defendant initialed the form several times. Agent Neese said that he read the questions on the waiver form to the Defendant, that one of the questions was whether the Defendant was "under the influence of an intoxicant and/or drugs," and that the Defendant said he was not under the influence. Agent Neese stated that the Defendant was responsive, answered questions appropriately, appeared to understand the questions, and did not appear intoxicated.

Agent Neese testified that Investigator Moore took notes while he interviewed the Defendant and that the interview was not recorded. Agent Neese stated that the Defendant did not request counsel. Agent Neese said that after the interview concluded, Investigator Moore typed a "statement" based on her notes. Agent Neese stated that the Defendant was given several breaks during the interview, that the Defendant agreed to provide a DNA sample, and that the Defendant allowed Investigator Neese to take photographs of the Defendant's hands. Agent Neese stated that the interview lasted about three hours and ended when the Defendant said he no longer wanted to speak with them. Agent Neese said that the Defendant was arrested and charged with first degree premeditated murder after the interview.

On cross-examination, Agent Neese testified that the Lawrence County Sheriff's Department did not have a policy requiring an interview be audio or video recorded and that he did not recall whether he asked the Defendant about his level of education. Agent Neese acknowledged that the Defendant looked "sleepy" and said that he assumed a correctional officer woke the Defendant before the interview.

Lawrence County Sheriff's Investigator Amy Moore testified that she took notes while Agent Neese interviewed the Defendant, that the interview was not audio or video recorded, and that she typed the Defendant's "statement" based on her notes. She stated that she could not recall whether Agent Neese reviewed her notes before she typed the statement. She said that only she, Agent Neese, and the Defendant were present during the interview and that Agent Neese read the Defendant his *Miranda* rights. She stated that Agent Neese reviewed the waiver of rights form with the Defendant and that the form included questions relative to the Defendant's level of education and whether he was under the influence of an intoxicant. Although she did not recall the Defendant's being asked the questions from the waiver form, she said that Agent Neese always asked each question on the form. She stated that she might have asked a few questions during the interview and that she might have asked the Defendant to clarify some of his answers.

Investigator Moore did not recall the Defendant's being asked whether he took any medication or about his mental condition before he received his *Miranda* rights. She described the Defendant's demeanor as tired but not upset. She stated that the interview started after 2:00 a.m., that the Defendant seemed alert, and that he did not complain that he was tired. She said that the Defendant was given breaks throughout the interview.

On cross-examination, Investigator Moore testified that neither she nor Agent Neese threatened or coerced the Defendant during the interview and that the interview was not confrontational. She stated that the Defendant was emotionless throughout the interview and that, at times, he closed his eyes and dropped his head. She said the Defendant did not appear intoxicated. Investigator Moore stated that the interview ended when the Defendant said he no longer wished to talk and that the Defendant was arrested. She said that the interview lasted one and one-half hours.

The trial court denied the Defendant's motion to suppress. The court found that the Defendant was advised of his *Miranda* rights and that he effectively and intelligently waived his rights. The court determined that the interview concluded after the Defendant stated he no longer wished to speak with the officers.

**Jury Trial**

Shanda Matney testified that on June 21, 2014, she, Lauren Hooper, and Sara Henderson went swimming and that afterward she and her two friends drove Ms. Hooper's Toyota 4Runner to an area called The Bowl. Ms. Matney stated that as the

-3-

4Runner approached the entrance of The Bowl, she saw the victim lying on her side by the road. Ms. Matney said that she saw the Defendant standing near the victim, that he appeared calm, that his shirt was ripped, and that he was covered in blood. Ms. Matney stated that the Defendant's truck was parked near the victim and that she saw a pool of blood near the truck.

Ms. Matney testified that Ms. Hooper parked the 4Runner near the victim. Ms. Matney stated that she sat in the front passenger seat, that she opened the door, and that she asked the Defendant if he needed help. Ms. Matney said that the Defendant walked toward the 4Runner and that the Defendant said the victim tried to kill herself. Ms. Matney stated that she walked to the victim, who had wounds on the back of her head and severed left fingers. Ms. Matney said that the victim was moaning and breathing but that the victim's eyes were closed. Ms. Matney stated that two ATVs stopped at the scene; that two men, two women, and two children were on the ATVs; and that one of the women, Ms. Thompson, told her to get inside the 4Runner.

Ms. Matney testified that she tried to call 9-1-1, that she and the 9-1-1 operator could not communicate, and that she video recorded the incident with her cell phone. Ms. Matney stated that Mr. Thompson, one of the men driving an ATV, spoke with a 9-1-1 operator. Ms. Matney said that Ms. Hooper drove Ms. Matney and Ms. Henderson in the 4Runner to a nearby intersection to assist an ambulance in locating the victim. Ms. Matney said she, Ms. Hooper, and Ms. Henderson stood by the 4Runner. Ms. Matney stated that she saw the Defendant run toward them, that she "freaked out," and that she and the other girls got in the 4Runner. Ms. Matney said that the Defendant walked to the window of the 4Runner and said, "Seriously, I didn't do this, or something along those lines," and that Mr. Thompson walked to the 4Runner.

Ms. Matney testified that the Defendant walked behind the 4Runner and picked up the victim's purse and shoes from the road. Ms. Matney stated that she saw a kitchen knife with a black handle and a broken blade on the road between the victim's shoes and purse and the victim.

Ms. Matney testified that the Defendant identified himself as "Doc" from South or North Carolina. Ms. Matney stated that the Defendant did not tell her the victim's name and that the Defendant said the victim was his fiancée. Ms. Matney recalled the Defendant's saying that he and the victim were driving in his truck and that the victim started cutting herself after he said he no longer loved her. Ms. Matney stated that she was present when police officers arrived and that she did not recall anyone moving the broken knife and blade before the police arrived. Ms. Matney said that an ambulance arrived between thirty minutes and one hour after she and her friends encountered the Defendant and the victim. Ms. Matney stated that she did not see the Defendant speak to, comfort, and help the victim. Ms. Matney said that the Defendant did not ask anyone to help the victim.

The video recording taken from Ms. Matney's cell phone was received as an exhibit, and Ms. Matney described the recording as it was played for the jury. Ms. Matney stated that the Defendant's truck was parked on the left side of the road leading to The Bowl, that two ATVs were parked to the right of the truck, and that the victim lay on the ground to the right of the 4Runner. Ms. Matney said that blood was on the road and that a "chunk" of the victim's hair was detached from the victim's head but lying nearby. Ms. Matney stated that Mr. Thompson stood on an ATV, trying to call 9-1-1. Ms. Matney said that the Defendant repeatedly looked toward the 4Runner and that she tried to hide her phone. Ms. Matney stated that Ms. Thompson instructed her, Ms. Hooper, and Ms. Henderson to drive to the main road to wait for the police or an ambulance and that she stopped recording.

On cross-examination, Ms. Matney testified that she was age eighteen at the time of the incident. Ms. Matney acknowledged that in one statement, she wrote that the Defendant asked her, Ms. Hooper, and Ms. Henderson to drive to the main road to "flag down the ambulance, because his fiancé[e] was dying." Ms. Matney stated that she did not recall what part of the Defendant's shirt was ripped and that she could not describe the shirt. Ms. Matney did not recall when she called 9-1-1 and said that the ATVs arrived at the scene less than five minutes after she arrived.

Sara Henderson testified that she, Ms. Hooper, and Ms. Matney were in Ms. Hooper's 4Runner driving toward The Bowl when Ms. Henderson saw a truck and that Ms. Hooper parked the 4Runner behind the truck. Ms. Henderson said that she saw the victim lying on the ground to the right of the truck and that the Defendant was "walking around." She stated that the victim appeared injured, that the victim was bleeding, and that part of the victim's hair was missing from her head. Ms. Henderson said that she asked the Defendant if he needed help, that the Defendant said, "No, she did this to herself," and that the Defendant said the victim tried to kill herself.

Ms. Henderson testified that Ms. Matney tried to call 9-1-1 but did not have cell phone service to complete the call. Ms. Henderson stated that she had been to The Bowl previously and that she did not have cell phone service because of the remote location. Ms. Henderson said that she and Ms. Hooper walked around the 4Runner with Ms. Matney while Ms. Matney tried to obtain cell phone service, that she and Ms. Hooper got in the 4Runner after Ms. Matney could not complete a call, and that Ms. Matney walked to the victim. Ms. Henderson stated that two ATVs arrived within one or two minutes and that a person driving an ATV called 9-1-1. Ms. Henderson said that she was unable to hear most of the Defendant's conversation with the people on the ATVs but that she heard the Defendant say the victim "did it to herself."

Ms. Henderson testified that she felt relieved when the others arrived at the scene, that she sat in the 4Runner for the duration of the incident, and that the Defendant "turned his truck around the other way" on the road. Ms. Henderson stated that the Defendant

-5-

walked around and that she did not see the Defendant approach, help, or speak to the victim.

Ms. Henderson testified that she, Ms. Hooper, and Ms. Matney drove away from the scene and parked at a nearby intersection where the road to The Bowl intersected with a public road. Ms. Henderson said that she could not see the victim from the 4Runner but that she heard conversations. Ms. Henderson stated that she heard a man and a woman on one of the ATVs speaking to the victim and that the victim moaned but did not respond. Ms. Henderson said that the Defendant ran toward the 4Runner and that she, Ms. Matney, and Ms. Hooper got back in the 4Runner. Ms. Henderson stated that when the Defendant reached the 4Runner, he said, "Really" in a tone she interpreted as meaning the Defendant thought she and her friends should not be afraid.

Ms. Henderson testified that the Defendant appeared calm during the incident. Ms. Henderson stated that when she and her friends arrived, the Defendant wore a shirt and that, at some unknown time, the Defendant removed it. Ms. Henderson said that the Defendant had blood on his shirt, body, and jeans and that his shirt was ripped.

Ms. Henderson testified that after the Defendant walked away from the 4Runner, he picked up the victim's purse and shoes from the road, and placed them beside the victim. Ms. Henderson said that the strap on the victim's purse had been cut, that the victim's shoes lay on opposite sides of the road and that she saw a broken knife and knife blade on the road.

Ms. Henderson testified that after the Defendant said, "Really," he asked if she, Ms. Matney, and Ms. Hooper were going to get help and that they told him they were waiting on the ambulance to arrive. Ms. Henderson stated that two men, two women, and two children were on the two ATVs, that she did not know them, and that she did not know the Defendant and the victim. On cross-examination, Ms. Henderson testified that she heard the Defendant make statements to the victim including, "Come on, Michelle, come on baby," and, "You can make it."

Jerrod Wallace testified that he was on an ATV with his wife, his daughter, and his nephew and that the Thompson family was on a second ATV on the day of the incident. Mr. Wallace stated that his daughter was age two and his nephew was age four at the time of the incident and that the two children were seated in the back of the ATV. Mr. Wallace stated that after his and the Thompson families left The Bowl, he saw a truck and a 4Runner parked in the road, that the truck and the 4Runner were facing in the direction of The Bowl, and that the 4Runner was parked behind the truck.

Mr. Wallace testified that he saw three girls speaking with the Defendant in the road and that the victim lay by the road. Mr. Wallace stated that the victim's breathing was loud and that she was making a "gurgling" sound. Mr. Wallace said that he got out

of his ATV and that he walked to the front of Mr. Thompson's ATV. Mr. Wallace stated that he saw blood on the victim and that he walked back to his ATV to sit with the children because he knew this was a bad situation.

Mr. Wallace testified that he heard the Defendant say to the victim, "Baby why did you do this to me," that the Defendant said the victim had used the Defendant's shaving knife to commit suicide, and that the victim had accused the Defendant of infidelity. Mr. Wallace stated that the Defendant never said the victim tried to hurt him. Mr. Wallace testified that Mr. Thompson called 9-1-1 and that Ms. Thompson asked Mr. Wallace to drive his ATV to another location to wait for the ambulance to arrive.

Mr. Wallace testified that he drove the ATV to the highway and parked at an abandoned gas station. He stated that he stopped a wildlife officer in a green truck, that he told the officer a woman "had been cut up" near The Bowl, and that the officer followed him to the intersection near the scene. Mr. Wallace said that the three girls sat inside the 4Runner at the intersection, that he parked his ATV to wait for the police, and that the officer went to the scene. Mr. Wallace stated that that an ambulance and deputies from the Lawrence County Sheriff's Department arrived shortly after he parked.

Mr. Wallace testified that one of the girls in the 4Runner approached him and that the girl said she needed to show him something on the road. Mr. Wallace stated that he followed the girl and that he saw a puddle of blood and a broken knife handle on the road. Mr. Wallace did not recall seeing the knife's blade.

Amy Wallace testified that she and her family and the Thompson family were riding ATVs on the day of the incident. Ms. Wallace stated that after leaving The Bowl, she saw a truck and a 4Runner parked on the road. Ms. Wallace stated that she saw the victim lying by the road, that she saw the Defendant speaking with three girls, and that Mr. Wallace parked their ATV. Ms. Wallace said that she remained in the ATV with the children, that she heard the victim breathing, and that it sounded as though the victim was "suffering to breath." Ms. Wallace stated that she asked Mr. Wallace to return to the ATV and that the Defendant followed Mr. Wallace. Ms. Wallace said that the Defendant walked to the passenger side of the ATV and that the Defendant said the victim accused him of infidelity and looked for an instrument inside his truck she could use to commit suicide. Ms. Wallace stated she did not respond to the Defendant.

Ms. Wallace testified that the Defendant walked to the front of Mr. Thompson's ATV and that Mr. Thompson called 9-1-1. Ms. Wallace stated that Mr. and Ms. Thompson asked Mr. Wallace to drive Mr. Wallace's ATV to the highway to meet the ambulance and that she, Mr. Wallace, and the children left the scene. Ms. Wallace said that she did not see an ambulance or the police when they reached the highway and that Mr. Wallace stopped a truck driven by a wildlife officer. Ms. Wallace stated that the officer drove to the scene and that Mr. Wallace parked the ATV at the intersection.

Ms. Wallace testified that the 4Runner was parked in the intersection, that the Defendant stood outside the 4Runner for a "short period of time," and that the Defendant started running toward the victim after Mr. Wallace parked the ATV. Ms. Wallace said that the girls in the 4Runner walked to the ATV and that the girls said they saw a knife in the road. Ms. Wallace stated that she stayed in the ATV and that Mr. Wallace walked to the knife with the girls. Ms. Wallace said that she did not see the Defendant help the victim during the incident.

Lauren Hooper testified that she, Ms. Matney, and Ms. Henderson went swimming on the day of the incident and that Ms. Hooper drove her 4Runner. Ms. Hooper stated that she drove toward The Bowl and that she saw a truck parked in the road. She said that the truck faced The Bowl and that she parked behind the truck. She stated that she saw the victim lying by the road and that the Defendant stood near the victim. Ms. Hooper said that the Defendant and the victim were covered in blood, that the Defendant wore a shirt and jeans, and that his shirt had a hole in the middle. Ms. Hooper stated that she did not get out of the 4Runner, that she heard the victim moaning, and that the victim had difficulty breathing. Ms. Hooper said that she asked the Defendant if he needed help and that the Defendant said the victim tried to kill herself.

Ms. Hooper testified that she and her two friends stayed in the 4Runner until two ATVs arrived about three minutes later. Ms. Hooper stated that the Defendant spoke with the people on the ATVs, that she and her friends got out of the 4Runner, and that she checked on the victim. Ms. Hooper said that the victim did not move and was bloody. Ms. Hooper stated that Ms. Matney and Mr. Thompson called 9-1-1, that Mr. Thompson stood on his ATV to obtain cell phone service, and that she and her friends got back in the 4Runner.

Ms. Hooper testified that she drove the 4Runner to an intersection near the scene to wait for an ambulance because she and her friends were scared. Ms. Hooper stated that she could not see the Defendant's truck or the victim from the intersection. Ms. Hooper said that she saw a pool of blood, a knife, a purse, and shoes at the intersection. Ms. Hooper stated that she heard someone running toward the 4Runner, that she saw the Defendant, and that she and her friends got in the 4Runner. Ms. Hooper said that the Defendant walked to the passenger window and said, "Really? Do you think I did this? I didn't do this." Ms. Hooper stated that the Defendant picked up the purse and shoes and carried them toward the victim.

Ms. Hooper testified that the Defendant walked to the 4Runner again, that the Defendant said his name was "Doc," and that the Defendant said the victim was from North or South Carolina. Ms. Hooper stated that she did not see the Defendant approach or render aid to the victim. Ms. Hooper said that the Defendant removed his shirt after the ATVs arrived. Ms. Hooper stated that the Defendant was not emotional, that he "just walked around," and that he never asked her to help the victim.

Monica Thompson testified that she and her husband, Nicholas Thompson, rode ATVs with the Wallace family on the day of the incident. Ms. Thompson stated that she saw a truck, a 4Runner, and four people standing on the road. Ms. Thompson stated that Mr. Thompson parked the ATV in front of the truck, that she saw blood on the passenger side of the truck's bed, and that the truck's passenger door was open. Ms. Thompson said that she and Mr. Thompson got out of the ATV and that Mr. Thompson asked the group if they needed help. Ms. Thompson stated that the Defendant said he and the victim had argued and that the victim had cut herself. Ms. Thompson said that Mr. Thompson asked if anyone had called 9-1-1 and that one of the girls said they did not have adequate cell service to complete a call. Ms. Thompson stated that Mr. Thompson stood on his ATV to call 9-1-1 and that she checked on the victim.

Ms. Thompson testified that the victim had several body wounds and bled from her ears. Ms. Thompson stated that the victim lay on her left side, that her left arm was "spread out," that her right arm was folded under her body, and that her knees were slightly bent. Ms. Thompson said that the victim was barefoot and that blood was everywhere. Ms. Thompson stated that she noticed a laceration on the victim's left hand and that the victim's left ring finger was severed. Ms. Thompson said that the victim was moaning, that the victim's eyes were half open, and that the victim did not respond when Ms. Thompson spoke to her.

Ms. Thompson testified that the three girls asked the Defendant questions relative to the incident and that the Defendant appeared nervous. Ms. Thompson stated that she asked the girls to sit in the 4Runner, instructed them to lock the doors, and told them to video record the incident on a cell phone. Ms. Thompson said that she told Mr. and Ms. Wallace to stay in the ATV with the children because she did not want the children to see the blood. Ms. Thompson stated that she told the Wallace family to leave the scene with the children and that they drove to a gas station to wait for an ambulance. Ms. Thompson said that Mr. Wallace had a gun in his ATV, that Mr. Wallace tried to "slip" Ms. Thompson the gun before he left, and that she never obtained possession of the gun because the Defendant watched.

Ms. Thompson testified that she told the Defendant to move his truck to make room for an ambulance and that the Defendant moved the truck. Ms. Thompson stated that the Defendant said he and the victim argued, that the Defendant told the victim, "Don't do this to me, baby," and that the Defendant said, "Why did she do this to me? You know they're going to pin this on me." Ms. Thompson said that the Defendant walked around and to the back of his truck repeatedly. Ms. Thompson stated that she told the Defendant to speak to the victim to keep the victim conscious and that the Defendant spoke to her a few times for a few seconds. Ms. Thompson said that she did not see the Defendant approach the victim before she asked the Defendant to speak to the victim.

Ms. Thompson testified that the Defendant "kept asking about the girls" in the 4Runner and that the girls appeared to make the Defendant nervous. Ms. Thompson stated that she told the girls to drive the 4Runner to the intersection. Ms. Thompson said that the Defendant walked to the bed of his truck, that the Defendant retrieved a machete, and that the Defendant said the victim had used the machete to cut herself. Ms. Thompson stated that the Defendant walked toward her and Mr. Thompson, that Mr. Thompson told the Defendant to place the machete in the bed of the truck, and that the Defendant complied. Ms. Thompson stated that the Defendant said he felt as though he might "pass out" and that the Defendant fell into the bushes beside the victim. Ms. Thompson said that Mr. Thompson walked to the Defendant, helped the Defendant stand, and that Mr. Thompson gave the Defendant water.

Ms. Thompson testified that she heard a door shut in the direction of the intersection and that the Defendant started running toward the 4Runner. Ms. Thompson stated that Mr. Thompson handed her a cell phone and that Mr. Thompson instructed her to call 9-1-1 to request the police and to inform the police that the Defendant had a machete. Ms. Thompson said that Mr. Thompson chased the Defendant toward the intersection and that she called 9-1-1.

Ms. Thompson testified that before the Defendant ran toward the girls, one of the girls walked in sight and motioned for Ms. Thompson to walk toward the 4Runner. Ms. Thompson stated that the girl had seen a knife, blood, shoes, and a purse on the road near the 4Runner. Ms. Thompson said that the broken knife and blade were about thirty or forty yards from the victim. Ms. Thompson stated that she told the girls not to touch the knife, the shoes, and the purse and instructed the girls to stay near the 4Runner.

Ms. Thompson testified that after she called 9-1-1, the Defendant continued walking around after he returned to the scene. Ms. Thompson stated that the Defendant tried to shake the victim, that he said, "Come on, baby get up," and that she told him to stop touching the victim.

Ms. Thompson testified that a wildlife officer and an ambulance arrived, that a paramedic told the officer to handcuff the Defendant, and that the police arrived. Ms. Thompson stated that the police escorted the Defendant away from the victim. Ms. Thompson said that when the Defendant returned from the 4Runner, he placed a purse and shoes at the victim's feet.

On cross-examination, Ms. Thompson testified that the 4Runner was not visible after the girls parked at the intersection and that she heard a door slam. Ms. Thompson said that the Defendant might have said, "Where's that f------ ambulance?" Ms. Thompson said that after the Defendant returned, the Defendant said the girls would not help him and that Ms. Thompson told him the girls were scared.

-10-

Nicholas Thompson testified that he and Ms. Thompson were riding ATVs with the Wallace family on the day of the incident. Mr. Thompson stated that after he left The Bowl, he saw a truck and a 4Runner parked on the road. Mr. Thompson stated that he saw the victim "laying in the ditch" and that he parked the ATV. Mr. Thompson stated that he saw the Defendant and three girls standing near the victim and that he initially thought the victim might have fallen out of the bed of the truck. Mr. Thompson said that he asked the Defendant if anyone had called 9-1-1 and that he did not recall the Defendant's answer. Mr. Thompson stated that he stood on the top of his ATV, that he called 9-1-1, and that he tried to give the dispatcher directions to the victim.

Mr. Thompson testified that he saw a lot of blood, that a couple of the victim's left fingers were missing, that she had a severe laceration on her back, and that he saw wounds on her body. Mr. Thompson stated that the victim lay on her left side, almost in a fetal position and that the Defendant said the victim had cut herself.

Mr. Thompson testified that his wife told the three girls to drive to the end of the road and to wait for an ambulance. Mr. Thompson stated that the Wallaces left to "flag the ambulance in." Mr. Thompson stated that he spoke to the victim, that the victim was unconscious, that he heard the victim breathing, that he heard a "really loud groan[]" each time the victim tried to exhale, and that he told the Defendant to speak to the victim.

Mr. Thompson testified that the Defendant said he felt like he might pass out and that the Defendant fell near the victim. Mr. Thompson stated that the Defendant lay face-down and that Mr. Thompson shook the Defendant with his hand. Mr. Thompson said that he told the Defendant to stand, that he and the Defendant walked to Mr. Thompson's ATV, and that he gave the Defendant water. Mr. Thompson stated that the Defendant said, "I know they're going to blame this on me, whenever they get here."

Mr. Thompson testified that the Defendant walked to the Defendant's truck and wiped his face. Mr. Thompson stated that the Defendant removed a machete from the bed of the truck and said, "This is what she did it with." Mr. Thompson said that he told the Defendant to place the machete back in the truck and that the Defendant complied. Mr. Thompson stated that the Defendant started running toward the intersection, that his wife instructed him to check on the girls, and that he told his wife to call 9-1-1 to tell them "something is not right."

Mr. Thompson testified that he saw the Defendant standing near the 4Runner. Mr. Thompson stated that the Defendant walked away from the 4Runner, that the Defendant picked up a purse and shoes from the road, and that he placed the purse and shoes next to the victim. Mr. Thompson said that the ambulance arrived about five minutes later, that he and Ms. Thompson remained at the scene, and that a wildlife officer arrived. Mr. Thompson testified that he did not see any injuries on the Defendant's body and that the Defendant did not say he was injured.

Paramedic Melissa Bivens testified that she worked for the Lawrence County Ambulance Service at the time of the incident and that she went to the scene. Ms. Bivens said many people were at the scene and that she saw the victim lying on the side of the road. Ms. Bivens said that a wildlife officer arrived after the ambulance.

Ms. Bivens testified that she could hear the victim's "gasping for air" when she got out of the ambulance and that the victim and her clothes were "saturated" in blood. Ms. Bivens stated that the victim was unresponsive and that she had numerous cuts and stab wounds on her body. Ms. Bivens said that the Defendant was standing near the victim, that the Defendant wore jeans, and that the Defendant was covered in blood. Ms. Bivens stated that Lawrence County Sheriff's deputies arrived and that one deputy took photographs with a cell phone.

Ms. Bivens testified that she used a bag valve mask to help the victim breath until they moved her into the ambulance. Ms. Bivens stated that the Defendant said the victim had been cutting herself all day and that Ms. Bivens did not see the Defendant again after the wildlife officer arrived. Ms. Bivens said the Defendant did not receive medical treatment. Ms. Bivens stated that the victim was taken to a trauma center by helicopter. Ms. Bivens said that she used every bandage in the ambulance to treat the victim's wounds.

Tennessee Wildlife Officer Phillip Smith testified that he worked on the day of the incident, that he was driving home around 4:30 or 5:00 p.m., and that a man driving an ATV stopped him. Officer Smith stated that he followed the ATV to the scene. Officer Smith said that he saw the victim lying on the right side of the road, that she was on her left side, and that she was covered in blood. Officer Smith stated that the Defendant wore jeans and no shirt and was covered in blood.

Officer Smith testified that before arriving at the scene, he saw three girls inside a 4Runner at a nearby intersection, that the ATV parked at the intersection, and that the girls directed him to the scene. Officer Smith stated that an ambulance was at the scene when he arrived, that he told the Defendant to stay away from the victim, and that the Defendant said, "She done [sic] this to herself and I tried to keep her from doing this to herself." Officer Smith stated that the victim was unconscious and made a gurgling sound when trying to breathe. Officer Smith said that the Defendant did not appear to be injured and did not receive medical treatment.

Paramedic Kyle Wisdom testified that he worked with Ms. Bivens on the day of the incident and that he drove the ambulance to the scene. Mr. Wisdom stated that he saw the victim lying on the ground, that the Defendant stood near the victim, and that a wildlife officer arrived. Mr. Wisdom stated that both the victim and the Defendant were covered in blood and that the officer escorted the Defendant away from the victim. Mr.

Wisdom said that the victim struggled to breathe and that she had sustained many lacerations, cuts, and scrapes.

Mr. Wisdom testified that he tried to control the victim's bleeding and that the victim remained on the ground for about ten minutes before she was placed in the ambulance. He said that he tried to start an IV and to help the victim breathe. Mr. Wisdom said that a Lawrence County Sheriff's Deputy drove the ambulance to the fire department where a helicopter took the victim, who was still alive, to the trauma center.

TBI Special Agent Nathan Neese testified that he was a lieutenant with the Lawrence County Sheriff's Department at the time of the incident and that he went to the scene at about 5:00 or 6:00 p.m. Agent Neese stated that he spoke with several Lawrence County Sheriff's deputies, that the deputies showed him various blood stains along the road, and that he saw a large pool of blood near a parked truck. Agent Neese said that the victim was not at the scene when he arrived and that the Defendant sat in the back of a patrol car. Agent Neese stated that the Defendant wore boots, jeans, and no shirt. Agent Neese said the Defendant had blood on his jeans, boots, and wrist watch and that the Defendant was calm.

Agent Neese testified that he instructed Investigator Moore to take photographs of the scene, that he interviewed Ms. Matney, and that Ms. Matney told him she had video recorded the incident on her cell phone. Agent Neese stated that it was a large crime scene and that 383 feet separated the first blood stain and the victim's location. Agent Neese said that he saw a broken knife lying nearby and that the knife was 225 feet from the victim. He said that he collected evidence from the scene and that the evidence was preserved for DNA analysis and sent to the TBI crime laboratory.

Agent Neese testified that two buccal swabs from the Defendant's mouth, and swabs from his right palm, his right index finger, his left palm, and his left index finger were collected for DNA analysis. Agent Neese stated that a DNA standard was taken from the victim during her autopsy.

Agent Neese testified that the Defendant was removed from the patrol car and that photographs were taken of the Defendant. Agent Neese stated that the Defendant was taken to the Lawrence County Sheriff's Department, that he instructed one of the deputies to collect the Defendant's clothes, and that Agent Neese later collected the clothes from an evidence locker. Agent Neese said that the Defendant's wallet, a Samsung cell phone, and an LG cell phone battery were taken from the Defendant when he was detained. Agent Neese stated that miscellaneous papers, receipts, a handgun carry permit, an insurance card, and a work identification card were also taken from the Defendant.

Agent Neese testified that he found a machete, a shovel, a t-shirt, and a metal rake in the bed of the Defendant's truck. Agent Neese stated that he collected a black purse

from the scene and that the purse contained a Visa card showing the victim's name, an LG cell phone, and an apartment key. Agent Neese said that the LG cell phone did not contain a battery. He stated that he found black "slip-on shoes" lying next to the victim.

Agent Neese testified that he later spoke with the Defendant, that the Defendant identified where he and the victim lived, and that Agent Neese obtained and executed a search warrant at the Defendant and the victim's apartment. Agent Neese stated that the search was conducted to help identify the victim and that the search started at 1:09 a.m. He said that he knocked on the door, but nobody answered, and that he used a key to unlock the door. Agent Neese said that he searched clothes on the floor, the refrigerator, and the garbage. He stated that he found a receipt from G.G.'s Market in Collinwood, Tennessee, in the pocket of camouflage pants, and that the receipt was dated June 21, 2014, and showed the Defendant's name.

Agent Neese testified that the items he found in the truck were collected as evidence, that the truck was taken to the impound lot, and that he obtained a search warrant a few days later. He stated that an officer took photographs of the outside and the inside of the truck before the search started. He said that a reddish-brown stain was on the steering wheel cover, that he collected the cover as evidence, and that the cover was sent to the TBI crime laboratory for analysis. He stated that a fingernail was in the driver's side door panel and that a nine-millimeter Luger cartridge casing was on the driver's seat. Agent Neese said that a reddish-brown stain was on the passenger seat and that he removed the foam and cloth covering the seat. Agent Neese stated that the truck had a bench seat in the rear of the cab and that items were stored under the bench seat. He said that he found a Smith and Wesson nine-millimeter handgun, a magazine for the handgun, six live rounds of Luger ammunition, and a black holster inside a box under the seat. He stated that the six live rounds were consistent with the cartridge casing found on the driver's seat.

Agent Neese testified that a hand print and a reddish-brown stain were on the right rear exterior panel of the truck, that he tried to transfer a fingerprint to an index card, and that the card was sent for analysis. He identified photographs of a twelve-pack of beer in the floorboard and the center console with a reddish-brown stain. Agent Neese stated that miscellaneous items and latex gloves were in the console.

Agent Neese testified that he obtained a drone from Homeland Security, which he flew above the scene several months after the incident to create a video recording. The video recording was played for the jury, and Agent Neese narrated for the jury. He stated that he parked his patrol car where the first evidence placard was placed, that he flew the drone from Wisdom Road to the "chert pit road to The Bowl," and that he made a U-turn with the drone to fly toward his car. Agent Neese used a laser pointer to show the jury where certain evidence was found, the victim lay, and the Defendant's truck was parked.

Agent Neese testified that he interviewed the Defendant after the search of the apartment and that the interview started at about 2:00 a.m. Agent Neese provided testimony consistent with his testimony at the suppression hearing regarding the Defendant's police interview. The interview summary prepared by Investigator Moore was received as an exhibit and read to the jury.

During the interview, the Defendant stated that the victim had an outstanding fugitive arrest warrant and that they were engaged. He said that about two weeks before the incident, he received a telephone call from his uncle, who said the victim had kicked a hole in the wall of the Defendant's and the victim's apartment. The Defendant stated that the victim accused him of being intimate with other women and that the allegations were false. He said that on the day of the incident, he returned from National Guard training and that he got in his truck at about noon in Waynesboro to drive home. He stated that he stopped in Wayne County, purchased beer with a credit card, and drove to his apartment.

The Defendant said that he and the victim drove around in his truck, that he told the victim it would be better if she returned to North Carolina or Michigan, and that she said she loved him. The Defendant stated that the victim became emotional, yelled, and cursed. He said that he stopped the truck to urinate and that the victim "jumped out." He stated that the victim used the machete from the back of the truck and a kitchen knife to cut herself and that the victim always carried a kitchen knife. He said that after the victim cut herself, he asked the victim whether she was alright and that he turned the victim over to help her to breathe. He said that he saw a woman, that the woman asked if he needed help, and that he told the woman the victim had cut herself. He stated that he walked to his truck to retrieve his cell phone and that another man said an ambulance was on the way.

The Defendant stated that the victim cut herself, that she "just went crazy," and that he closed his eyes because he did not want to watch. He said he tried to help her and that he moved his truck to make room for an ambulance. He stated that he picked up her purse and shoes and that he placed the items next to her. He said he did not know why the shoes and purse were in the road because everything happened quickly. He stated that he told the victim to stop cutting herself, that she ran down the road, and that he drove his truck toward her. The Defendant said that the victim used the knife before she used the machete and that she "was going at it."

The Defendant stated that he worked for a federal transport company, that he transported the victim from North Carolina to a holding facility in Kentucky when she was incarcerated, and that she obtained his telephone number. He stated that the victim called him after she was released, that she rode a Greyhound bus from Michigan to Nashville, and that he picked her up at the bus station. The Defendant said that the victim was in jail for vandalism, burglary, and assault with a deadly weapon. He stated

-15-

he had spoken previously with the victim's mother, who said that she was happy the victim had found a good man, and that the victim had been suicidal previously.

The Defendant stated that before the incident, his uncle informed him that the victim had been "running wild while [he] was gone" and that the uncle heard the victim had been "messing around." The Defendant said the victim had used cocaine previously. He said that the blood on his hands belonged to the victim, that he touched her wounds to determine where she was bleeding, and that she had injuries to the back of her head and neck. He stated that the victim "hit rocks and slid," that his "military tactics kicked in," and that he provided first aid until the ambulance arrived.

When Agent Neese asked the Defendant whether Agent Neese could collect the blood from the Defendant's hands, the Defendant stated it was the victim's blood. The Defendant stated that he did not know how he received the scrape on his knuckle and that he thought it might have been from a rock and from "applying pressure." He consented to providing a DNA sample.

During the interview, the Defendant was informed that the victim had died, and he responded, "Oh, man." After Agent Neese said that he did not believe the victim's injuries were self-inflicted, the Defendant stated, "God is my witness. I'm not the guilty one here. I'm trying to make a living, nothing else to say." The Defendant stated that he did not kill the victim, that the victim cut herself, and that he tried to help her. He said that he was in the military and that he had no reason to kill her. When asked whether the victim threatened him with the knife or machete, he responded, "No, I tried to keep my distance. I would say 'Look, stop,' and she would swing at me and I would step back." He stated that the first time he touched the victim was when he provided aid. The Defendant said that he did not hit her with the machete and that he no longer wished to speak with the investigators.

Agent Neese testified that the LG cell phone battery found in the Defendant's pocket did not match the Defendant's Samsung cell phone, that the battery matched the victim's cell phone, that he found the victim's cell phone in the victim's purse, and that her cell phone did not contain a battery.

On cross-examination, Agent Neese testified that the Defendant was given breaks during the interview and that the interview lasted a "little longer than an hour." Agent Neese that he did not know about the victim's history of mental illness and drug use before the Defendant was charged with first degree premeditated murder and that he was unaware that the victim had attempted suicide previously. In Agent Neese's opinion, the victim's injuries were not self-inflicted. Agent Neese said that he later learned from interviews and from items he found in the apartment that the victim had been a prostitute.

-16-

Agent Neese testified that the victim had scars on her body, that he had spoken with an FBI agent about the scars, and that the scars were unrelated to the injuries she received during this incident. Agent Neese stated that he saw a hole in the wall at the apartment and that he did not find any other indication of a physical altercation. Agent Neese said that he did not find any knives in the apartment matching the knife found at the scene. He stated that he found female clothing in the apartment and that he did not recall seeing luggage or packed items.

Agent Neese testified that he obtained a second search warrant for the apartment on June 23, 2014. Agent Neese stated that during the first search, an officer found an LG cell phone battery and placed it on a table. Agent Neese said that the purpose of the second search was to retrieve the battery.

Agent Neese testified that the fingernail found in the Defendant's truck belonged to the victim. Agent Neese said that he found a Garmin GPS system and a travel transport log in the truck and that the log showed the Defendant had transported the victim to Kentucky when she was incarcerated. Agent Neese stated that the Defendant's Samsung cell phone was a Tracfone, that he did not know whether the victim's LG cell phone was a Tracfone, and that a forensic analysis was conducted on the Defendant's phone.

Agent Neese testified that several deputies secured the scene and that each deputy was required to sign a crime scene log. Agent Neese acknowledged that Deputy Dennis Cody's and the "officer in charge['s]" signatures were not included on the log. Agent Neese stated that he arrived at the scene at 5:46 p.m. and that the Lawrence County Sheriff's Department had a crime scene van equipped with "evidence collecting material" and that the van had a spotlight to assist in after-dark investigations. He stated that the investigation was not completed before nightfall but that the van was not used. Agent Neese said that the scene had been photographed and evidence had been marked before dark. He stated that he and other officers used flashlights to finish collecting the evidence. Agent Neese said that he completed a diagram of the scene a few days after the incident and that the diagram was based on photographs, memory, and witness statements.

Agent Neese testified that a urine sample was collected from the Defendant, that a urine sample was typically collected to detect the presence of drugs or alcohol, but that Agent Neese did not request the Defendant provide a sample. Agent Neese stated that the Defendant said he had purchased beer, that a twelve-pack of beer was found in the Defendant's truck, and that an unspecified portion was missing. Agent Neese said that he did not ask the Defendant whether he drank beer before the incident because the Defendant was not intoxicated. Agent Neese stated that he probably was the person who ordered the disposal of the Defendant's urine sample. Agent Neese said that the sample was taken at the jail, that officers did not have a sterile environment needed to collect a

sample, and that a sample should be collected at a hospital. On redirect examination, Agent Neese testified that he did not think the TBI crime laboratory would have analyzed the Defendant's urine sample and that he would have collected a blood sample if he had thought the Defendant were intoxicated.

TBI Special Agent Doug Williams testified that he analyzed the Defendant's Samsung cell phone for the contact list, call log, text messages, emails, video recordings, and photographs taken on or about June 21, 2014. Agent Williams said that based on the cell phone records and data, the Defendant did not call 9-1-1 on June 21, 2014.

On cross-examination, Agent Williams testified that if a telephone call were attempted from a cell phone that did not have adequate service, the call would not be recorded in the call log. He stated that he would have needed a subpoena to obtain subscriber records and that he was never asked to determine who was associated with the numbers in the call log. Agent Williams said that several incoming, outgoing, and missed telephone calls were associated with a contact labeled as "Wife" and that several calls were associated with a contact labeled as "Home." Agent Williams stated that the Defendant's phone placed a telephone call to the contact "Wife" on June 21, 2014 at 2:54 p.m., and that the call lasted about three minutes. On redirect examination, Agent Williams testified that the last entry was an incoming telephone call from Home at 4:10 p.m.

Dr. Adele Lewis, an expert in forensic pathology, testified that she conducted the victim's autopsy. Dr. Lewis stated that the victim received multiple sharp force injuries to her head, arms, and hands. Dr. Lewis stated that the victim received a five inch laceration to her throat, which injured the muscles on the right side of the neck and the thyroid gland. A photograph of the victim's throat was received as an exhibit.

Dr. Lewis stated that the victim suffered three sharp force injuries to the left side of her head. Photographs of the three injuries were received as exhibits. Dr. Lewis said that the victim received a three inch wound to her scalp, which damaged the scalp and the underlying muscles. Dr. Lewis stated that the victim received a three inch wound on the left side of her neck, which damaged the skin and muscles. Dr. Lewis said that the victim received a two inch wound near the top left side of her head. Dr. Lewis stated that the injury was a "chop wound," that it was a combination of blunt and sharp force, and that it was created by a heavy object with a sharp edge, such as an axe. Dr. Lewis said that the chop wound fractured the victim's skull and bruised her brain. Dr. Lewis stated that the wound was "curvilinear."

Dr. Lewis testified that the victim received two wounds to the back of her neck. Dr. Lewis stated one of the wounds damaged the skin and soft tissue under the skin. Dr. Lewis said that the other wound injured the skin and the muscles in the neck.

Dr. Lewis testified that the victim suffered a sharp wound that cut part of the victim's right ear and damaged the skin behind her ear.  Dr. Lewis said that the wound did not involve any major blood vessels, arteries, or bodily organs.  She stated that the victim received a wound on the back of the right side of her head.  She said that the injury was a chop wound and was caused by a combination of blunt and sharp force.  Dr. Lewis stated that the wound had "irregular edges" and that the wound measured two by four inches.  She said that the wound caused bleeding under the scalp, a fractured skull, and bruising and swelling of the brain.

Dr. Lewis testified that the victim suffered a superficial wound on her upper right arm.  Dr. Lewis said that the victim received a wound on the right palm and that the wound was near the bottom of the victim's "first" finger.  Dr. Lewis stated the wound had slightly jagged edges, was a "U-shape," and injured the skin, the soft tissue under the skin, and the hand muscles.  Dr. Lewis stated that the victim received a superficial wound on her upper left arm.  She stated that the victim received a superficial wound on the inside of her arm, near her elbow, and that the wound had a "slight dried yellow appearance," indicating that the wound was inflicted when the victim had low blood pressure or was dead.  Dr. Lewis said that, based on the appearance of the wound, she believed the victim received the wound after the other wounds.

Dr. Lewis testified that the victim suffered a chop wound to her left palm that "went through" the victim's left third finger, almost amputated the victim's middle finger, and injured her left "first" finger.  Dr. Lewis said that the wound injured the skin, soft tissue, skeletal muscles, and the bones in her left hand.  Dr. Lewis stated that the victim received superficial wounds near her left thumb and thumbnail.  Dr. Lewis said that the victim's left hand bones were injured by a sharp heavy object.  Dr. Lewis stated that the victim received a wound to the back of her left forearm, that the wound had sharp edges, and that it injured the skin and soft tissue under the skin.  Dr. Lewis said that the victim received a second wound on her upper left arm, that the wound was curvilinear, and that the wound injured the skin and soft tissues.  Dr. Lewis said that the wounds on the victim's upper left arm appeared to have been inflicted when the victim's blood pressure was low based upon a "somewhat dried yellow appearance."

Dr. Lewis testified that the victim received a wound on the back of her left arm and that the wound was three inches, had a "slight curve," and injured the skin, soft tissues, and arm muscles.  Dr. Lewis said that the victim received a curvilinear wound on her left shoulder.  Dr. Lewis stated that three superficial, small wounds were near the wound on the victim's left shoulder.  Photographs of each of the victim's wounds were received as a collective exhibit.

Dr. Lewis testified that the appearance of some of the victim's wounds led her to conclude that they were inflicted when the victim had low blood pressure, which could have been caused by blood loss.  Dr. Lewis stated that a toxicology analysis showed the

presence of a cocaine metabolite but that cocaine was not present. Dr. Lewis said that the amount of the cocaine metabolite would not have affected the victim. Dr. Lewis stated that the cause of death was multiple sharp force injuries.

On cross-examination, Dr. Lewis testified that she could not determine which wound was fatal and that she did not know the sequence in which the victim received the wounds. Dr. Lewis said it was possible that some of the wounds could have been self-inflicted, including the wound on the victim's neck. Dr. Lewis stated that she could not determine, based on the blood found at the scene, whether the victim was walking or running when she received her wounds. Dr. Lewis said that she could not determine when the victim used cocaine.

Dr. Lewis testified that at the time of the autopsy, she was unaware of the victim's previous suicide attempt and that she was informed the victim had a history of previous drug use and prostitution. Dr. Lewis stated that the victim had a scar on her upper left arm and forearm, had several scars around her naval, and had one circular scar on the front of her right leg. Dr. Lewis said that the scars were not associated with past surgical procedures.

On redirect examination, Dr. Lewis testified that none of the victim's scars affected the autopsy findings, including the victim's cause of death. Dr. Lewis said that it would have been difficult for the victim to self-inflict the wounds on her back, head, and hands.

TBI Special Agent Forensic Scientist Cathy Gibson, a latent fingerprint expert, testified that she analyzed a piece of plastic, a broken piece of a knife blade, a broken piece of a knife's blade attached to a handle, a shovel, and a machete for latent fingerprints and that she examined "latent lifts" from the Defendant's truck. Agent Gibson said that the only item that had a value was the latent lift from the Defendant's truck and that a latent lift was used to preserve a latent fingerprint. Agent Gibson stated that latent fingerprint from the truck matched the victim's right index fingerprint.

TBI Special Agent Mark Dunlap, an expert in serology and forensic biology, testified that he analyzed evidence for the presence of DNA and human blood. Agent Dunlap stated that he analyzed a broken piece of knife blade and that the blade showed the presence of human blood and the victim's DNA. Agent Dunlap said that he analyzed a broken piece of a knife blade attached to a handle and that both the blade and handle showed the presence of human blood and the victim's DNA. Agent Dunlap stated that he analyzed a shovel found in the Defendant's truck and that human blood and the victim's DNA were on the metal end of the shovel. Agent Dunlap said that he analyzed a machete from the Defendant's truck and that human blood and the victim's DNA were present on the curve of the machete blade.

Agent Dunlap testified that he analyzed the Defendant's boots, that human blood and the victim's DNA were present on the inner-side of the left boot, and that human blood and the victim's partial DNA profile were present on the back of the right boot. Agent Dunlap stated that he analyzed two stains on the Defendant's jeans, that one stain was located in the knee area, and that the other stain was closer to the front right pocket. Agent Dunlap said that analyses of both stains showed the presence of human blood and the victim's DNA. Agent Dunlap stated that he analyzed swabs taken from the Defendant's hands and that human blood was present. Agent Dunlap said that the major contributor of DNA on the Defendant's left palm was the victim and that the minor contributor of DNA was the Defendant. Agent Dunlap stated that human blood was present on the Defendant's right palm, right index finger, and left pinky finger and that DNA analysis was not conducted because it was unnecessary based upon the results from the Defendant's left palm. Agent Dunlap said that he analyzed the fingernail clippings from the victim and that human blood and the victim's DNA were present.

Agent Dunlap testified that he later received foliage, a rock, a broken necklace, and swabs collected from a reddish-brown stain on the road at the scene. Agent Dunlap stated that analysis of all of the items showed the presence of human blood and the victim's DNA.

On cross-examination, Agent Dunlap testified that it was possible the shovel showed the presence of human blood and the victim's DNA because the Defendant's shirt touched the shovel in the bed of the truck. Agent Dunlap stated that he did not analyze the shovel handle for touch DNA because the handle was analyzed for latent fingerprints. Agent Dunlap said that the Defendant's DNA was not found on the handle of the broken knife or the machete blade. Agent Dunlap stated that he did not analyze the machete handle for touch DNA and that it was analyzed for latent fingerprints.

Lawrence County Sheriff's Department Investigator Amy Moore testified that she went to the scene and that the victim was not present when she arrived. Investigator Moore stated that she and Agent Neese walked through the area, that she spoke to the officers at the scene, and that she photographed the scene.

Investigator Moore testified that she video recorded a "walkthrough" of the scene, which showed roads, vehicles, and a blood trail. The recording was played for the jury. Investigator Moore stated that the recording showed a blood trail starting on Wisdom Road and that the blood was on some of the leaves on the side of the road. She said that the broken knife blade and a broken knife blade attached to a handle were found near the intersection of Wisdom Road and the road leading to The Bowl. She stated that she walked on the left side of the road toward The Bowl and that the Thompsons' ATV was parked at the scene. Investigator Moore said that she turned around, that the Defendant's truck was parked at the scene and that she recorded the items found in the back of the truck and the truck's front passenger door. Investigator Moore stated that she recorded

-21-

the large pool of blood where the victim was found, the victim's shoes, and strands of the victim's hair.

Investigator Moore testified that she processed the scene for evidence, that she placed placards along the road to identify evidence, and that she took photographs. Investigator Moore stated that she collected samples from the blood stains on the road with buccal swabs and the victim's turtleneck, shirt, and bra that paramedics had cut from the victim's body. She said that no analyses were performed on the clothing. She stated that a hole in the collar of the victim's turtleneck appeared to correspond with the cut on the victim's throat. Investigator Moore said that the victim's pants and underwear were cut from the victim's body at the medical examiner's office and that she collected the clothing. Investigator Moore stated that the victim's fingernails were cut during the autopsy and that she collected the fingernail clippings.

On cross-examination, Investigator Moore testified that she was present during the Defendant's interview and that she took notes. Investigator Moore stated that she typed her notes into a transcript of the interview and that the Defendant never saw or signed the typed "statement." Investigator Moore said that the interview was not audio or video recorded and agreed that an interview is generally more accurate if it were recorded. She said that she participated in both searches of the Defendant and the victim's apartment and that she looked for items identifying the victim during the first search. Investigator Moore stated that the purpose of the second search was to retrieve a cell phone battery found during the first search.

Investigator Moore testified that the victim's cell phone was not analyzed by the TBI and that she did not examine the victim's cell phone. Trial counsel placed a battery in the victim's cell phone and asked Investigator Moore questions relative to the cell phone. Investigator Moore stated that the "screen saver" on the cell phone was a photograph of the Defendant and the victim. Investigator Moore said that the incident occurred on June 21, 2014, and that the Defendant was at National Guard camp for two weeks before the incident. Investigator Moore said that the victim sent the Defendant two sexually explicit text messages on June 9, 2014. Investigator Moore stated that the victim sent the Defendant one sexually explicit text message and another message that read, "Hey babe, I love you, Wifey" on June 11, 2014. Investigator Moore said that the victim sent a text message to the Defendant on June 14, 2014, that read, "To Babe, sorry if I caused you any distress, baby. I'm loving you so much. Please forgive me, your future wife." Investigator Moore stated that the victim sent a June 17, 2014 text message that read:

> "I called Mom, told her you said give me some money for phone and some
> pocket money, and you will give back when you come home. She said let
> her call and talk to you. I don't think she believed me. So call her as soon
> as you get this text. Then call me or text me back. Love you Babe."

Investigator Moore stated that on June 19, 2014, the victim sent a text message to the Defendant that read, "Hey, Babe, I'm loving you with all my heart, Your Wifey." Investigator Moore said that the victim sent another text message on June 20, 2014, that read, "To Babe, all I needed to know is when I leave that you won't [call] the police." Investigator Moore stated that according to the call log on the victim's cell phone, the victim called the Defendant at 2:54 p.m. on the day of the incident.

Investigator Moore testified that the victim's hairs collected from the scene were hair extensions. Investigator Moore stated that the Lawrence County Sheriff's Department's crime van was not used because law enforcement finished processing the scene before dark.

Lawrence County Sheriff's Department Captain Adam Brewer testified that he went to the scene, that he interviewed the witnesses, that law enforcement processed the scene for several hours. Captain Brewer said that a receipt from G.G.'s Market was found in the Defendant's pants pocket and that G.G.'s Market was in Collinwood, Tennessee, a few miles from the Defendant's parents' home. Captain Brewer said he participated in a second search of the Defendant's apartment to retrieve an LG cell phone battery, which was retrieved from the kitchen table. Captain Brewer stated that he later placed the battery in the victim's cell phone and that the battery powered the phone. He said that he grew up near the Defendant's parents' home and that he knew the Defendant's family. Captain Brewer stated that before the incident, he spoke with the Defendant's father about possibly employing the Defendant with the Lawrence County Sheriff's Department.

On cross-examination, Captain Brewer testified that he did not see signs of a physical altercation and domestic violence in the apartment. Captain Brewer stated that he did not find any knives during the searches that matched the broken knife at the scene.

A stipulation was received as an exhibit and read to the jury. The stipulation was as follows:

On January 22, 2013, [the victim] made the following statement under oath before the Circuit Court Judge of the 17th Judicial District, State of Michigan: "I've been off my medication that I'm supposed to take that keeps me stable since [20]04 and back in September after another suicide attempt they finally put me on that medication, and I've been promised that I won't go a day without it. Like last time I went like a month without it and it caused me to self-medicate."

Johnny Lawrence, an expert in crime scene interpretation analysis and blood stain pattern analysis, testified for the defense that he was a private investigator and a former police homicide detective and crime scene specialist and that he reviewed the evidence in

this case. Mr. Lawrence stated that generally a diagram of a crime scene should be completed before evidence is collected because the diagram must include "triangulation" or "baseline" measurements of where evidence is located. Mr. Lawrence said that he went to the scene twice, that the first time he "sat there and pictured what could have happened" based on the photographs he reviewed, and that the second time he took photographs of the scene. Mr. Lawrence stated that he located spots on the road that might have been blood stains, that he tried to take measurements based on the evidence he had reviewed, and that he used a "walking measuring stick." He said that the photographs of the scene and the Defendant's truck were of poor quality because of the time of day in which they were taken and that portable lighting should have been used when photographing the scene if it were needed.

Mr. Lawrence testified that ninety degree photographs were critical in this case because the scene was large, that he would have been able to determine the direction in which the victim walked if he had the photographs, and that he could have determined whether the stains were impact or passive. Mr. Lawrence stated that he would have diagramed the scene differently and with more detail. Mr. Lawrence said that he noticed in some photographs that certain vehicles were present at the scene, that those vehicles were not present in other photographs, and that those vehicles should not have been permitted to leave until the scene was processed. Mr. Lawrence said that law enforcement properly marked the evidence and that without the ninety degree photographs he could not determine where the scene began and ended. Mr. Lawrence stated that although investigators took photographs of the Defendant's truck, the photographs were not taken in close enough proximity to the truck. Mr. Lawrence said that some of the photographs were "blacked out" because the sun was shining in the camera lens.

Mr. Lawrence testified that the scene had been contaminated because, based on the photographs, some of the vehicles were permitted to leave before the scene was processed fully. He said that the blood stains had been driven or walked through and that dirt and rocks had been kicked into certain stains. He stated that although some of the scene contamination was unavoidable, some was preventable.

Mr. Lawrence testified that he saw several transfer blood stains and a slight impact stain on the passenger door of the Defendant's truck. Mr. Lawrence stated that it appeared a bloody hand tried to open the passenger door, that the hand had transferred dirt and gravel to the handle, and that the hand left an impact stain. He stated that blood was found on the inside passenger door and on the passenger seat. Mr. Lawrence said that a blood stain was on the right taillight area and that the stain appeared to be a hand impression. Mr. Lawrence stated that no measurements were taken of the stain and that he might have been able to enhance a ninety degree photograph to determine whether it was the victim's or the Defendant's handprint. Mr. Lawrence said that a transfer stain was on the driver's door and that "satellite stains" were on the right front of the truck.

-24-

Mr. Lawrence stated that satellite stains appeared as a "mist" of blood and that the stains had fallen on the vehicle from a seventy to ninety degree angle.

Mr. Lawrence testified that he reviewed photographs of the inside of the truck, that the steering wheel had transfer stains, and that the stains might have occurred when the Defendant moved his truck to allow the ambulance to park close to the victim. Mr. Lawrence stated that a stain was present on the center console, that the stain was not enhanced with any chemicals, and that it might have been caused by the Defendant's arm. Mr. Lawrence said that transfer stains were on the interior of the driver's door and that the stains might have been caused by the Defendant's entering and leaving the truck. Mr. Lawrence stated that photographs were taken of the inside passenger door and that he could not determine if blood were on the "door jam" or if it were "some kind of marking." Mr. Lawrence said that he saw transfer stains "where the pocket goes below the armrest" and that he saw "almost a faint impression of some fingers that had been inside the pocket." He stated a bloody hand "had been hanging on to the grip on the door." He said that the passenger seat had saturation stains, that something very bloody had been on the seat at some point, and that the cloth of the seat had absorbed the blood.

Mr. Lawrence testified that he reviewed photographs of the scene, that the road to The Bowl was composed of a mixture of dirt and gravel, and that the road absorbed the blood and distorted the pattern. He stated that he saw several pools of blood and passive stains, which were caused by "free-flowing blood." Mr. Lawrence said that six placards were placed in the dirt next to a grassy area on Wisdom Road, that blood was on the grass, and that passive blood stains were present at each placard. Mr. Lawrence said the passive stains indicated that blood was dripping when someone was standing.

Mr. Lawrence testified that it seemed as though an altercation occurred at the intersection near the scene because of a disturbance of the gravel. He stated that a broken kitchen knife was in the intersection in separate pieces and that he saw several drops of blood. He said that transfer stains were on the ground and that the stains indicated "something bloody was on the ground." Mr. Lawrence stated that several placards were placed on the road toward The Bowl and that he saw two red posts, which he said were used to close the road. He said that he saw more stains on the ground and that the stains were consistent with fabric or skin touching the ground. He stated that he saw a pool of blood past the red posts and that it indicated "somebody was there for a period of time." Mr. Lawrence said a very large pool of blood existed where the victim was found. Mr. Lawrence stated that he saw a "slight pooling area" next to the Defendant's truck, which had been moved, that transfer stains were present, and that it indicated clothing or "something" had been on the ground.

Mr. Lawrence testified that he saw photographs of the evidence found in the bed of the Defendant's truck and that he would have "enhanced" the shovel to determine whether latent fingerprints were on the handle. Mr. Lawrence stated that the shovel had a

wipe stain, that it was possible the stain was caused by coming into contact with the Defendant's bloody shirt, and that the bloody shirt was found on top of the shovel.

The Defendant testified that he joined the military in 2009 and that he was honorably discharged. He stated that he was a member of the National Guard and worked as a prisoner transport agent at the time of the incident. He said that he met the victim when he transported her during her incarceration and that he gave the victim his telephone number. The Defendant stated that the victim called. He said that the victim came to Nashville by bus and that he picked up the victim at the bus station. He stated that the victim lived with him in Colombia, Tennessee, for about one month and that he and the victim moved to an apartment in Lawrenceburg. The Defendant said that he and the victim became engaged and that he learned the victim had previously used drugs, been a prostitute, and participated in "knife fights." He said the victim had scars from the knife fights.

The Defendant testified that he attended a two-week National Guard camp in June 2014, that he parked his truck at the National Guard Armory in Waynesboro, and that he rode a bus with other Guard members to Camp Shelby in Mississippi. The Defendant stated that he left camp on the day of the incident, that he drank with other National Guard members on the bus ride from camp, and that he was "a little messed up there." The Defendant said that he drove his truck to Collinwood and that he purchased a twelve-pack of beer from G.G.'s market.

The Defendant testified that he spoke with the victim when he was at camp by telephone and by text message and that the victim's telephone number was labeled "Wifey" in his cell phone. He stated that he and the victim had disagreements when he was at camp, that his uncle said the victim was engaged in prostitution when the Defendant was not home, and that the victim denied the allegations. The Defendant said he learned from the victim that she and the Defendant's uncle had an argument because of his uncle's allegations. He stated that he and the victim spoke by telephone and that they "worked things out." The Defendant said that he spoke with the victim's mother about "the situation," that he spoke with the victim by telephone during the bus ride home, and that his relationship with the victim at the time was "good." He stated that he and the victim exchanged sexually explicit text messages, that some messages sent by the victim were about his uncle's allegations, and that the Defendant and the victim spoke by telephone several times. The Defendant said that he called the victim at about 2:40 p.m. on the day of the incident, that he was almost home at this time, and that he and the victim were excited to see each other.

The Defendant testified that he ate when he returned home and that he and the victim changed clothes. The Defendant said that he and the victim did not have an altercation before leaving the apartment, that he saw a hole in the kitchen wall, and that the hole was "connected" with the victim's "being mad at [his] uncle." The Defendant

-26-

stated that he and the victim intended to drive to a secluded area past The Bowl to have sexual intercourse.

The Defendant testified that it usually took about twenty or thirty minutes to drive to The Bowl from his apartment and that he and the victim started arguing about his uncle's allegations when driving on Wisdom Road. The Defendant stated that the victim accused the Defendant of believing his uncle, that the victim became "agitated," and that he and the victim started "cussing each other." The Defendant said that the victim threatened to kill his uncle, that he told the victim to stop making threats, and that the argument escalated. The Defendant stated that he asked the victim whether she was using drugs and that the victim admitted she had used drugs when he was at camp. He said that the victim accused him of having an affair and that he told her she had to go home to Michigan or North Carolina.

The Defendant testified that before he turned his truck around, the victim retrieved a knife from her purse. He stated that he asked the victim what she was doing, that the victim said, "I'm not going nowhere (sic)," and that the victim cut her throat with the knife. He said that he stopped the truck and that the victim got out of the truck. He stated that the victim started crying and walking down the road toward The Bowl. He said that he spoke with the victim through the open truck windows, that the victim continued walking, and that he drove the truck beside the victim. He stated that he parked the truck at the intersection and got out of the truck.

The Defendant testified that he started walking toward the victim to help her and that the victim said, "Somebody's going to f------ die tonight." He stated that the victim had the knife in her hand and that the victim started running toward him. He said that he grabbed a machete from the bed of his truck and that he kept tools, such as a rake and shovel, in the bed of his truck for electrical jobs. He said that he stood near the bed of the truck and that he told the victim to stop but that she did not. He stated that he tried to get in the truck but that he and the victim "started engaging in blows." The Defendant said that the victim intended to kill him and that he did not recall how many times he struck the victim with the machete.

The Defendant testified that he and the victim stopped fighting and that he got in his truck. He stated that the passenger door remained open, that the victim tried to get in the truck, and that he started driving toward The Bowl. He said that the victim "got on the door of the truck," that she fell off, and that she was "dragged a little bit." He stated that he stopped the truck and tried to call 9-1-1 but that he did not have cell phone service. The Defendant said that he got out of the truck, that the victim lay on the ground near the passenger-side door, and that she appeared hurt. He stated that the victim was moaning and that he tried to help her stand but that she could not. The Defendant said that he dragged the victim to a shaded area near the bushes because it was hot, that he saw the victim's wounds, and that a 4Runner parked behind his truck.

The Defendant testified that he asked the girls in the 4Runner for help and that two ATVs stopped almost immediately after the 4Runner. The Defendant stated that he felt stressed, sick, and upset. He said that the girls parked the 4Runner in the intersection of the road, that he walked to the 4Runner, and that he was "trying to get them to go and get some help." He stated that he saw the victim's purse and shoes on the road and that he took the items to the victim. He said that someone told him to move his truck to make room for an ambulance to park near the victim, that he turned his truck around, and that he parked it on the other side of the road. He stated that he had a loaded nine-millimeter handgun in his truck for protection and that he had a handgun carry permit.

The Defendant acknowledged that he did not tell the truth at the scene or during the police interview and testified that he said the victim killed herself with the machete. The Defendant stated that he was scared and that he was sorry for not telling the truth initially. He said the victim did not try to kill herself with the machete but that the victim tried to kill herself with the kitchen knife.

On cross-examination, the Defendant testified that he spoke with the victim's mother by telephone when he was at camp and that he told the victim's mother he wanted the victim to leave. He stated that after he spoke with the victim's mother, he and the victim "worked everything out." He said that the machete, shovel, and rake were locked in the cab of the truck when he was at camp and that he placed the items in the bed of the truck before driving home. The Defendant stated that his handgun was locked in the console when he was at camp.

The Defendant testified that he reviewed his typed interview summary, that the summary was an accurate account of his conversation with Agent Neese, and that he did not tell the truth during the interview. The Defendant stated that all of the State's witnesses testified accurately and that he did not know of any evidence at the scene that could have helped his case. The Defendant said that he received a telephone call from his parents at about 4:10 p.m. on the day of the incident, that he answered it, and that he could not recall whether he spoke with his mother or father. The Defendant stated that he was not close to The Bowl when he received the call and that he did not know what time he and the victim arrived at the scene. He said that he was not injured during the altercation and that he did not know how many times he hit the victim with his machete. The Defendant stated that the altercation occurred in the intersection and that he could not recall whether he hit the victim with the machete at a location other than the intersection.

The Defendant testified that the victim retrieved a kitchen knife from her purse to cut her throat and that he did not know how the knife was broken. He stated that he did not hit the victim with the machete after she fell from of the passenger door, that he recalled testimony about the victim's suffering brain damage from the machete, and that he thought the measurement of more than 200 feet from the intersection to where he

-28-

dragged the victim was inaccurate. He said that he placed the machete in the bed of the truck after the altercation, that he tried to call 9-1-1 before he moved the victim to the side of the road, and that he assumed he had blood on his hands when he called 9-1-1. When asked whether he could explain the absence of blood on his cell phone, the Defendant responded, "The phone, I – I grabbed the phone and tried to – there's a button on there that I tried to press right there."

The Defendant testified that the victim was right-handed, that she had scars on her right arm, and that the victim said she received the scars during "knife fights." The Defendant stated that he did not know how the victim's left fingers were severed, that he assumed his shirt was torn during the "fight," and that he "felt some claws" on his shirt. He said that during the altercation, he and the victim were "both sliding and slipping out there" and that he never hit the victim with the machete when she was on the ground. He stated that he knew the victim was alive when she lay by the road because he heard her breathing.

The Defendant testified that he did not stab the victim with the kitchen knife, that he did not use the machete after the knife broke, and that he did not plan to bury her with the shovel. He stated that the victim had numerous cell phone batteries and that the victim charged different batteries to "switch them." He said that the victim asked him to place one of the charged batteries in his pocket before they left the apartment and that he assumed the victim had another battery in her phone.

The Defendant testified that he acted in self-defense, that he did not tell law enforcement he acted in self-defense before the trial, and that no one persuaded him to claim he acted in self-defense. He acknowledged that his parents were present at the preliminary hearing. The Defendant did not recall a conversation after the hearing with his mother and said he did not recall his mother's telling him to say he acted in self-defense. A portion of a recorded jail telephone call between the Defendant and the Defendant's mother was played for the jury.

In the recording, the Defendant and his mother both said they were upset. The Defendant's mother discussed obtaining money for the Defendant's bond, which she believed needed to be reduced. The Defendant's mother stated that she was not worried the Defendant would flee and that the Defendant could live with her and the Defendant's father. The Defendant's mother said, "Another thing, instead of saying that she did it herself, suicide, you need to say, h---, we got into a domestic situation, that's what you need to be saying." The Defendant responded, "That's what it was, yes." The Defendant's mother stated, "You know, she attacked me and I defended myself." The Defendant's response was intelligible. The Defendant's mother stated, "Tell the truth. (Unintelligible) attacked me with a butcher knife and I defended myself. That's what you need to be saying." The Defendant responded, "I know it. I know it." The Defendant's remaining response was unintelligible. The Defendant's mother stated that trial counsel

would visit and speak with the Defendant "straight up." The Defendant's mother told the Defendant to tell counsel that he and the victim argued and that the argument "got out of hand." The Defendant stated that he would speak with counsel, that the situation would be straightened out, and "that it would be straight to the truth." The Defendant's mother told the Defendant not to speak about his case with anyone but her, the Defendant's father, and counsel.

When the Defendant was asked, relative to the recording, whether it was his mother who said the Defendant needed to claim he and the victim argued during a domestic dispute, that the victim attacked him with a butcher knife, and that he acted in self-defense, the Defendant responded, "I'm guessing it is, you know." On redirect examination, the Defendant testified that his parents visited him at the jail before the telephone call and that they never discussed what happened during the incident.

Janie Simpson, the Defendant's mother, testified that on August 12, 2014, a preliminary hearing was held and that the jail telephone call previously played for the jury occurred later that day. Mrs. Simpson stated that she and the Defendant initially talked about reducing his bond during the call and that she understood that if she paid his bond, the Defendant would be released from jail until the trial. Mrs. Simpson said that the Defendant had been in jail about three weeks before the call and that she did not recall whether she visited the Defendant before the call. Mrs. Simpson stated that she wanted the Defendant to tell the truth and that she was "guessing" the incident was a domestic dispute.

Upon this evidence, the jury convicted the Defendant of second degree murder. This appeal followed.

## I. Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress his police statement because he did not "effectively and intelligently" waive his *Miranda* rights. The Defendant relies on *State v. Climer*, 400 S.W.3d 573 (Tenn. 2013), and argues that his statement should have been suppressed because he was intoxicated, sleep deprived, had a special education high school diploma, and had no previous experience with law enforcement. The State responds that the court did not err in denying the Defendant's motion to suppress. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest

legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

"In determining whether a waiver of *Miranda* rights was voluntary, knowing, and intelligent, the totality of the circumstances must be examined." *State v. Echols*, 282 S.W.3d 266 at 280 (Tenn. 2012). Factors such as

> the age and background of a defendant; his education and intelligence level; his reading and writing skills; his demeanor and responsiveness to questions; his prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail and language in which the *Miranda* rights were explained

are used to determine whether a defendant waived his *Miranda* rights. *Id.* at 280-81; *see also State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000).

The record reflects that Agent Neese read the Defendant his *Miranda* rights and that the Defendant signed a waiver of rights form. Investigator Neese stated that he read each question included on the waiver of rights form to the Defendant, that the Defendant was asked whether the Defendant was "under the influence of an intoxicant and/or drugs," and that the Defendant denied being under the influence. No evidence reflects that the Defendant was intoxicated during the interview.

The Defendant's interview started at about 2:17 a.m., and the testimony conflicts relative to the length of the interview. Agent Neese stated that the interview lasted about three hours, but Investigator Moore said the interview lasted one and one-half hours. Both Agent Neese and Investigator Moore said that the Defendant appeared tired. However, Agent Neese stated that the Defendant was responsive, answered questions appropriately, and appeared to understand the questions. Investigator Moore stated that the Defendant was alert and did not complain that he was tired during the interview.

Although the Defendant argues that his impaired mental ability, as indicated by his receiving a special education diploma from high school, hindered his ability to understand his *Miranda* rights, no evidence showed the Defendant did not understand his rights. Agent Neese stated that he introduced himself to the Defendant, that he told the Defendant why he wanted to speak with the Defendant, and that the Defendant understood. The Defendant did not ask questions relative to his *Miranda* rights, he wrote the date and time on the waiver form, and he initialed the form several times. The interview concluded when the Defendant invoked his right to remain silent.

Furthermore, the Defendant testified at the trial that he reviewed the statement and that it was accurate relative to his conversation with Agent Neese. Because the record supports the trial court's determination that the Defendant effectively and intelligently waived his *Miranda* rights, the Defendant has not shown that the trial court erred in denying his motion to suppress. He is not entitled to relief on this basis.

## II. Sufficiency

The Defendant contends that the evidence is insufficient to support his conviction of second degree murder. He argues that he should have been convicted of voluntary manslaughter because (1) the victim had previously attempted suicide; (2) the victim was under the influence of cocaine at the time of the incident; and (3) he was intoxicated and struck the victim with a machete in self-defense. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-381.

Second degree murder is defined as a knowing killing of another. T.C.A. § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (2014). With regard to second degree murder, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b) (2014); *see State v. Page*, 81 S.W.3d 781 at 787. "[T]he 'nature of the conduct' that causes death is inconsequential." *Page* 81 S.W.3d at 787. A knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

In the light most favorable to the State, the record reflects that the Defendant and the victim argued and that the incident escalated into a physical altercation. The Defendant testified that the victim used a kitchen knife from her purse to cut her throat. The Defendant testified that he hit the victim with a machete he retrieved from the back of his truck after the victim threatened him with the knife. The Defendant did not know how many times he struck the victim with the machete and did not know whether he struck her at any location other than in the intersection. The distance between the first blood stain on the road and where the victim was found was 383 feet, and the broken kitchen knife was found 225 feet from the victim.

DNA analysis showed that the victim's DNA was present on the broken kitchen knife blade, the curve of the machete blade, the Defendant's boots, jeans, and hands, foliage at the scene, a rock, and a broken necklace. The victim's cause of death was multiple sharp force injuries, which included injuries to her head, arms, and hands, and a five-inch laceration on her throat. The victim suffered three sharp force injuries to the left side of her head, one of which was a curvilinear chop wound fracturing the victim's skull and causing bruising to her brain. The victim received two wounds to the back of her neck, one of which was curvilinear. The victim received a sharp wound to her right ear and a chop wound to the right side of her head, which fractured her skull and caused bruising and swelling of the brain. The victim received a chop wound to her left palm, amputating the victim's left third finger, almost amputating her middle finger, and injuring her index finger. Dr. Lewis testified that although some of the wounds could have been self-inflicted, it would have been difficult for the victim to have inflicted the wounds on her back, head, and hands. A jury could have concluded beyond a reasonable doubt that the Defendant's hitting the victim with the machete multiple times was reasonably certain to cause the victim's death. The final jury instructions reflect that the trial court provided an instruction for self-defense and the jury's verdict reflects that it discredited the Defendant's testimony. The evidence is sufficient to support his second degree murder conviction. The Defendant is not entitled to relief on this basis.

### III. Autopsy Photographs

The Defendant contends that the trial court erred by admitting autopsy photographs because they were graphic and overly gruesome, that they were cumulative to Dr. Lewis's testimony, and that their probative value was substantially outweighed by their unfair prejudicial effect. The State responds that the Defendant has waived this issue on appeal because the Defendant included black and white copies of the photographs without the exhibit number and letter on each photograph. In the alternative, the State argues that the court did not abuse its discretion by admitting the photographs.

As a preliminary matter, we conclude that the Defendant has not waived appellate consideration of this issue. Supplemental Exhibit 55 contains the relevant photographs.

Exhibit 55 contains ten autopsy photographs introduced during Dr. Lewis's testimony. Each color photograph was labeled 55-A through 55-J.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). When determining the admissibility of such evidence, the trial court should consider

> their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id*. at 951. Unfair prejudice results when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Dotson*, 450 S.W.3d 1, 91 (Tenn. 2014) (quoting *Banks*, 564 S.W.2d at 950-51).

The Defendant submitted several pretrial motions addressing the admissibility of the 497 photographs included in the discovery. Relative to autopsy photographs, the trial court determined that twelve photographs were admissible at the July 23, 2016 hearing and in its written order. The court concluded that the photographs were not overly gruesome and that their probative value outweighed their prejudicial effect.

The Defendant only challenges five photographs contained in the collective exhibit. The five photographs show wounds to the victim's right ear, the right side of her head, and her left arm. The photographs assisted Dr. Lewis in explaining the victim's injuries and supported her conclusion that the cause of death was multiple sharp force

injuries. Likewise, the photographs were not overly gruesome because the wounds had been cleaned. The record supports the trial court's determining that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. The Defendant is not entitled to relief on this basis.

## IV. Jury Sequestration

The Defendant contends that the trial court erred by denying his motion to sequester the jury. The Defendant argues that he was denied a fair and impartial jury trial. The State responds that the court did not err by denying the Defendant's motion. We agree with the State.

At the August 23, 2016 motion hearing, trial counsel requested that the jury be sequestered during the trial. Counsel argued that jury sequestration was necessary to preserve the Defendant's rights to a fair trial and to an impartial jury. Counsel stated that the inconvenience to the jury would have been minimal because the trial would last one week.

The trial court stated that jurors typically followed the rules of the court and that the court would inform the jury of the rules. The court determined that it could protect the Defendant's right to a fair trial and that it would inform the jurors that they were to decide the case on the evidence introduced during the trial. The court denied the motion.

We review a court's denial of the Defendant's motion to sequester for an abuse of discretion. *See State v. Larkin*, 443 S.W.3d 751, 804 (Tenn. Crim. App. 2013); *see also State v. Larry Walcott*, No. E2004-02705-CCA-R3-CD, 2005 WL 2007203 at *6 (Tenn. Crim. App. Aug. 22, 2005). Tennessee Code Annotated section 40-18-116 states, "In all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." This court has determined that the "failure to sequester a jury standing alone could rarely, if ever, constitute reversible error. A defendant would have to demonstrate actual prejudice or at least substantial likelihood thereof flowing from the failure to sequester in order to warrant a new trial." *Larkin*, 443 S.W.3d at 804 (internal citations omitted).

The record reflects that the trial court instructed the empaneled jurors initially and before each recess to refrain from conducting their own investigations, from watching, listening, and reading news media relative to the case, and from speaking with anyone about the case. The court also instructed the jurors to decide the case only on the evidence presented at the trial. The Defendant has not presented any evidence that the jury did not follow the court's instructions, that he was prejudiced by the failure to sequester the jury, and that he was denied a fair trial because the jury was not

sequestered.  We conclude that the trial court did not abuse its discretion by denying the Defendant's motion to sequester the jury.  The Defendant is not entitled to relief on this basis.

## V.     Jury Instructions

The Defendant contends that the trial court erred by denying his request for four special jury instructions and by failing to provide an instruction for intoxication, although the court agreed to provide it.  The State responds that the court did not err by denying the Defendant's request for the four special jury instructions because the pattern jury instructions were a complete charge of the law.  The State argues that the Defendant waived his argument relative to the intoxication instruction because he failed to rectify the court's failure provide it at the trial.  In the alternative, the State asserts that the error was harmless.

A criminal defendant has "a right to a correct and complete charge of the law." *Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975).  A jury instruction related to general defenses is not required to be submitted to the jury "unless it is fairly raised by the proof."  T.C.A. § 39-11-203(c) (2014).  An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial.  *See Garrison*, 40 S.W.3d at 433-34.

The record reflects that the defense requested the trial court provide seven special jury instructions, four of which the court denied.  The Defendant requested that the court instruct that: "[a]ll homicides involving the use of a deadly weapon do not constitute first-degree murder" to further explain the law related to first degree premeditated murder.  The court determined that the pattern instruction for first degree premeditated murder was a complete charge of the law and denied the Defendant's request.

The remaining requested instructions related to voluntary manslaughter.  The Defendant requested that the trial court give instructions as follows: (1) "[o]ne who kills another in a passionate rage may dispose of the weapon when reason returns just as readily as the cool, dispassionate killer;" (2) "[t]he offense of voluntary manslaughter requires adequate provocation – there is no requirement that there is a 'rational' provocation;" and (3) [r]epeated blows to a victim can be delivered in the heat of passion, with no design or reflection."  The court denied the requested instructions and determined that the pattern instruction for voluntary manslaughter was a complete charge of the law.

The record reflects that the trial court gave the following instruction relative to first degree premeditated murder:

Any person who commits the offense of first degree murder is guilty of a crime. For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1)     That the defendant unlawfully killed the alleged victim; and

(2)     That the defendant acted intentionally. A person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim; and defendant's conscious objective need not to be to kill a specific victim; and

(3)     That the killing was premeditated.

A premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to the capable of premeditation. If the design to kill was formed with premeditation, it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect. Furthermore, premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided.

If you find from the proof beyond a reasonable doubt that the defendant is guilty of first degree murder, you will so report and your verdict in that event shall be "We, the Jury, find the defendant guilty of first degree murder."

The jury should not concern itself with punishment. Your sole responsibility is to determine whether or not the defendant is guilty of the charge. If the jury finds beyond a reasonable doubt the guilt of the defendant as to this offense, the court will fix the punishment in a separate hearing.

If you have a reasonable doubt as to the defendant's guilt of first degree murder, then your verdict must be not guilty as to this offense, and then you shall proceed to determine the defendant's guilt or innocence of the lesser included offense of second degree murder.

*See* T.P.I – Crim. 7.01.

Relative to voluntary manslaughter, the record reflects that the trial court instructed the jury as follows:

Any person who commits voluntary manslaughter is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1)     That the defendant unlawfully killed the alleged victim; and

(2)     That the defendant acted intentionally or knowingly, and

(3)     That the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

The terms "knowingly" and "intentionally" have been previously defined and have the same meaning here.

If you find from the proof beyond a reasonable doubt that the defendant is guilty of voluntary manslaughter, you will so report and your verdict in that event shall be "We, the Jury, find the defendant guilty of voluntary manslaughter."

If you have a reasonable doubt as to the defendant's guilt of voluntary manslaughter, then your verdict must be not guilty as to this offense, and then you shall proceed to determine the defendant's guilt or innocence of the lesser included offense of reckless homicide.

*See id*. at 7.06.

The definitions of "knowingly" and "intentionally" were given in the second degree murder jury instruction. The jury was instructed that "knowingly" was defined as:

> "Knowingly" means that a person acts with an awareness that his conduct is reasonably certain to cause the death of the alleged victim. If you find beyond a reasonable doubt that the defendant knowingly engaged in multiple incidents of the infliction of bodily injury against the alleged victim, you may infer that the defendant was aware that the cumulative effect of the conduct was reasonably certain to result in the death of the victim, regardless of whether any single incident would have resulted in the victim's death. However, you are never required to make this inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by the evidence in this case warrant any inference which the law permits you the jury to draw. Also, the inference may be rebutted by other evidence and circumstances. It is for the jury to determine, after a consideration of all the evidence, whether to make the inference which the law permits, the correctness of such inference, and what weight is to be given to such evidence.
>
> The requirement of "knowingly" is also established if it is shown that the defendant acted intentionally.

*See id*. at 7.05(a).

Relative to the definition of "intentionally," the trial court instructed the jury as follows: "'intentionally' means that a person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim." *See id*.

The record supports the trial court's determinations that the pattern instructions were a complete charge of the law. "Although the Pattern Jury Instructions do not have the force of law, our trial courts 'frequently use them as a source for jury instructions.'" *State v. Davis*, 266 S.W.3d 896, 901 n.2 (Tenn. 2008) (quoting *State v. Rutherford*, 897 S.W.2d 118, 120 (Tenn. Crim. App. 1993)). When reviewing jury instructions on appeal, the instruction must be considered and read as a whole rather than in isolation. *Hanson*, 279 S.W.3d at 280. We conclude that the trial court instructed the jury on the elements of both first degree premeditated murder and voluntary manslaughter and adequately defined key terms such as premeditation, knowingly, and intentionally.

"The purpose of a special instruction is 'to supply an omission or correct a mistake made in the general charge to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already

submitted to the jury.'" *Id*. (quoting *State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001)). "The refusal to grant a special request for instruction is error only when the general charge does not fully and fairly state the applicable law." *Hanson*, 279 S.W.3d at 280. The special instructions requested by the Defendant did not correct a mistake in the general charge and did not limit, extend, eliminate, or more accurately define a proposition. *See id*. We conclude that the pattern instructions, when read as a whole, properly instructed the jury on the applicable law. The Defendant is not entitled to relief on this basis.

The Defendant also requested that the trial court give an intoxication instruction. The court found that an intoxication instruction was appropriate but failed to give the instruction. As a preliminary matter, the Defendant has not waived this issue on appeal. Tennessee Rule of Criminal Procedure 30(b) states that after a trial court instructs the jury, "the parties shall be given an opportunity to object . . . to the content of an instruction that was given or the failure to give a requested instruction." If a trial court failed to give a requested instruction, a defendant may either object at the trial or allege the failure in his motion for a new trial. *See State v. Haynes*, 720 S.W.2d 76 (Tenn. 1986). "Counsel's failure to object does not prejudice the right of a party to assign the basis of the objection as error[.]" Tenn. R. Crim. P. 30(b); *see State v. Roy Daniel Mayo, II*, No. M2015-02267-CCA-R3-CD, 2016 WL 5385851 at *3 (Tenn. Crim. App. Sept. 26, 2016). Therefore, the Defendant has not waived appellate consideration of this issue.

"[I]ntoxication itself is not a defense to prosecution for an offense. However, intoxication, whether voluntary or involuntary, is admissible in evidence, if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a) (2014). Voluntary intoxication is defined as "intoxication caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known." *Id.* § 39-11-503(d)(3). This court has stated that

> proof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent. An intoxicated person might have . . . intent while a sober person might not.

*Harrell v. State*, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979). The key inquiry "is not whether the accused was intoxicated, but what was [the person's] mental capacity." *Id.*

The record reflects that the Defendant testified that he consumed beer on the way home from National Guard camp and purchased beer at G.G.'s Market. Officers found a twelve pack of beer in the Defendant's truck, and an unspecified portion of the beer was missing. The Defendant did not testify that he was intoxicated to the extent that he was unaware of his conduct. Rather, he testified that he struck the victim with the machete

after she attempted to cut him with a kitchen knife. No evidence showed that intoxication affected his capacity to form the culpable mental state required to commit second degree murder. *See State v. Jeffery Allen Boston*, No. M2010-00919-CCA-R3-CD, 2011 WL 4949932 at *8 (Tenn. Crim. App. Oct. 18, 2011) (concluding that although the evidence showed the defendant drank approximately twelve bottles of beer and shared a marijuana cigarette, the evidence did not show that his intoxication affected his ability to form the culpable mental state required to commit the offenses, including second degree murder).

Furthermore, both Agent Neese and Investigator Moore testified that the Defendant did not appear intoxicated. Agent Neese asked the Defendant whether he was under the influence of an intoxicant or drugs, and the Defendant said he was not. No evidence at the trial showed that the Defendant was intoxicated. The trial court erred in its determination that the instruction was proper because the evidence did not support the intoxication instruction. Thus, the trial court's inadvertence in failing to give the instruction was not erroneous. The Defendant is not entitled to relief on this basis.

## VI. Sentencing

The Defendant contends that he received an excessive sentence because the trial court erred in applying three of the enhancement factors. He also contends that the court erred by considering the portions of the presentence report relative to "juvenile activity" and to alleged domestic abuse. He argues the report contained unreliable hearsay. The State responds that the court did not abuse its discretion by applying the enhancement factors. The State argues that the Defendant waived the issue relative to the presentence report because the Defendant did not cite to any legal authority. In the alternative, the State argues that the Defendant was not prejudiced by the inclusion of the information contained in the reports because the court did not consider the reports relative to the juvenile activity and alleged domestic abuse when sentencing the Defendant.

The Defendant filed several motions relative to his sentencing. At the motions hearing, the Defendant objected to the "juvenile activity" that was included in the presentence report. The Defendant stated that he was not adjudicated delinquent for the incident that occurred when he was a juvenile and that the report contained unreliable hearsay. The Defendant said that the incident should have been stricken from the presentence report and that the report should have been redacted to exclude any references to the incident. The Defendant also objected to the inclusion of two police reports regarding alleged domestic disputes with his ex-wife, Brandi Simpson. The Defendant argued that the police reports contained unreliable hearsay. The trial court took the Defendant's motions under advisement and stated that it would rule on the motions at the sentencing hearing.

At the November 29, 2016 sentencing hearing, the presentence report was received as an exhibit. The report reflected that the Defendant was age thirty and had no

previous convictions. The report reflected that the Defendant had graduated from high school and was a certified electrician. The report showed that the Defendant had served in the Army and the National Guard and that he was honorably discharged from both. The Defendant reported alcohol use beginning at age seventeen but no longer used alcohol.

Tammy Mathis testified that she prepared the Defendant's presentence report. Ms. Mathis stated that she searched the Lawrence County Jail for police reports relative to the Defendant. Ms. Mathis said that she found a November 4, 2002 report from when the Defendant was a high school student. Ms. Mathis stated that she found an August 3, 2012 police report regarding a domestic assault. Ms. Mathis stated that she found a second police report from August 9, 2012, related to an "aggravated assault warrant." Ms. Mathis said that both the August 3 and 9, 2012 incidents were related to the Defendant's ex-wife, Brandi Simpson. Ms. Mathis said that the Defendant was never convicted of a crime and that she did not find any other incidents.

Ms. Mathis testified that the Defendant was previously in the military and that the Defendant was honorably discharged due to "misconduct." Ms. Mathis stated that she contacted military personnel and reviewed his military service records. Ms. Mathis said that she interviewed the Defendant to prepare the presentence report. Ms. Mathis stated that the Defendant was honorably discharged from the National Guard when he was incarcerated for the current offense.

On cross-examination, Ms. Mathis testified that two orders of protection against the Defendant relative to the August 3 and 9, 2012 incidents were dismissed and that the Defendant was not convicted of any crime related to the incidents. Ms. Mathis stated that an order dismissing one of the orders of protection stated:

> The petitioner is not a domestic abuse victim, stalking victim, or sexual assault victim, and that such determination is not based on the fact that the petitioner requested that the petition be dismissed, failed to attend the hearing, or incorrectly filled out the petition, and the petitioner knew that the allegation of domestic abuse, stalking, or sexual assault was false at the time the petition was filed.

Donna Whitney, the victim's mother, testified that the victim had lived in Jacksonville, North Carolina, and Grand Rapids, Michigan, for the majority of her life. Ms. Whitney stated that the victim had three children and three grandchildren. Two photographs of the victim and of the victim's family were received as exhibits.

Ms. Whitney testified that the victim's right arm was cut before this incident "with an object that was rigid" and that doctors reattached the arm. Ms. Whitney stated that the victim had limited use of her arm and that the victim could not drive or cook well. Ms.

Whitney said that the victim was a loving person and that they were a family. Ms. Whitney stated that she last saw the victim about three months before the victim's death.

On cross-examination, Ms. Whitney testified that the victim's arm was injured about fifteen years before the incident and that a woman cut the victim's arm with a "broken pop bottle." Ms. Whitney stated that the victim was right-handed and that she could not recall whether the victim's right or left arm was injured. Ms. Whitney said that the victim could use her arm to pick up small objects.

Teara Mayfield, the victim's daughter, testified that she was pregnant and had three children and that the victim was a good grandmother. Ms. Mayfield said that the victim was not always present during her childhood, that her mother was in her life as an adult, and that the timing of the victim's death was very difficult. Ms. Mayfield stated that the victim injured her arm about fifteen or twenty years earlier during an altercation with another woman and that the victim received surgery and rehabilitation for the injury. Ms. Mayfield said that the victim could not extend or bend her arm fully and that she thought the injury was to the victim's right arm. Ms. Mayfield stated that the victim could not reach behind her head with her arm and that the victim had difficulty driving and cooking.

Brandi Simpson, the Defendant's ex-wife, testified that she met the Defendant on Halloween in 2010, married the Defendant in June 2011, and divorced him in late 2012 or early 2013. Ms. Simpson stated that her relationship with the Defendant started to change during their honeymoon when the Defendant choked her. Ms. Simpson said that the Defendant became more physical after the honeymoon, that the Defendant slapped and grabbed her, and that the Defendant screamed at her in front of her daughter. Ms. Simpson stated that the Defendant thought she was being unfaithful, that he came to her place of employment in an attempt to catch her cheating, that the Defendant followed her home multiple times, and that he searched her vehicle multiple times for evidence of infidelity. Ms. Simpson said that the Defendant would sometimes come home in the middle of the day to "check the house."

Ms. Simpson testified that during one incident, she and the Defendant argued while driving in a car, that he hit her face with his hand, and that she called the police. Ms. Simpson stated that after she called the police, the Defendant drove her to his parents' house. Ms. Simpson said that the Defendant went in his parents' house, that she believed he went to retrieve a gun, and that the Defendant had shot at her previously. Ms. Simpson stated that while the Defendant was in the house, she started running through the woods, that the police called for her as she ran, and that she told the police she ran from the Defendant. Ms. Simpson said that she ran into someone's yard, where the police found her.

-43-

Ms. Simpson testified that the first time the Defendant attempted to shoot her was after he choked her. Ms. Simpson stated that she lost consciousness on the porch after he choked her and that she heard a "loud shot." Ms. Simpson said that she turned to face the Defendant, that the Defendant said he was not trying to kill her, and that the Defendant said he could have killed her had he wanted.

Ms. Simpson testified that the Defendant commonly used the gun as a scare tactic, that he once shot the gun in their home when her daughter slept in her daughter's bedroom, and that Ms. Simpson begged the Defendant to stop. Ms. Simpson stated that he showed her his gun on multiple occasions. Ms. Simpson said that, on one occasion, the Defendant put on gloves before removing the gun from the glovebox of their car and that the Defendant "looked in the backseat at [her] daughter." Ms. Simpson stated that the Defendant also showed her a machete at his parents' house and that the Defendant possessed many guns.

Ms. Simpson testified that, on one occasion, she and the Defendant argued on their way home from a Christmas party. Ms. Simpson stated that when they arrived home, the Defendant opened the passenger door and kicked her leg, which was bruised for weeks. Ms. Simpson said that by the end of the altercation, her lips were busted and her fingernails were broken.

Ms. Simpson testified that she and the Defendant separated about four times and that they reconciled each time. Ms. Simpson stated that the first time she called the police was in August of 2012 or 2013. Ms. Simpson stated that she and the Defendant had gotten into an argument and that the Defendant "fought [her] out of the front door, onto the ground in the yard." Ms. Simpson stated that she ran through the neighborhood with her daughter and that she knocked on several of her neighbors' doors for help. Ms. Simpson said that when the police arrived, the Defendant told the police that Ms. Simpson had threatened to cut the Defendant with a kitchen knife.

Ms. Simpson testified that, during one incident, the Defendant placed a fork against her throat and instructed her to lie on a rug. Ms. Simpson stated that the Defendant said he was going to shoot her, wrap her in the rug, and place her body in a river. Ms. Simpson said that she begged him to stop and that he pressed the fork against her throat harder.

Ms. Simpson testified that she wrote her mother and sister a letter because the Defendant had threatened to kill her so many times. Ms. Simpson stated that she wrote the letter to "let[] them know that [she] probably would never be seeing them again[] and that [she] was sorry for not listening." Ms. Simpson said she wrote that if she were to disappear, she "was gone because somebody made [her] gone." Ms. Simpson stated that ultimately she sought an order of protection, that she later requested the order be dismissed, and that it was dismissed.

On cross-examination, Ms. Simpson testified that she felt compelled to tell the trial court of the Defendant's history of violence and "cold-bloodedness." Ms. Simpson said that she understood her testimony might impact the Defendant's sentence. Ms. Simpson acknowledged that the she asked the court to dismiss the order of protection against the Defendant but that she was unaware her request would be interpreted as meaning her allegations were false. The State and the Defendant stipulated that the Defendant and Ms. Simpson were married on June 23, 2012.

Upon questioning by the trial court, Ms. Simpson testified that the details described in her petition for the order of protection were true, that the order was filed on August 6, 2012, and that the hearing was set for August 28, 2012. Ms. Simpson stated that she requested the order be dismissed because she and the Defendant had reconciled. Ms. Simpson said that she did not tell the court clerk that the information she had previously provided was false.

Kamiya Waddle, Ms. Simpson's sister, testified that she received a letter from Ms. Simpson when Ms. Simpson was married to the Defendant. Ms. Waddle stated that she never opened the letter because Ms. Simpson instructed her to open it only if Ms. Simpson died or disappeared. The sealed letter from Ms. Simpson was unsealed on the witness stand, received as an exhibit, and read on the record. The content of the letter corroborated Ms. Simpson's testimony relative to the Defendant's domestic abuse. The letter stated that Ms. Simpson should have listened to her family's warning relative to the Defendant and that the Defendant was responsible for Ms. Simpson's disappearance or death.

Ms. Waddle testified that Ms. Simpson and Ms. Simpson's daughter lived with her for about three months during one of the Defendant's and Ms. Simpson's separations. Ms. Waddle stated that during the last month Ms. Simpson was living with her, the Defendant called Ms. Simpson multiple times begging Ms. Simpson to come home and insisting he would change. Ms. Waddle said that the Defendant came to see Ms. Simpson, that Ms. Waddle did not allow the Defendant in her home because she was scared of the Defendant, and that the Defendant had threatened her and her family. Ms. Waddle stated that the Defendant parked his car next door at an abandoned house and that Ms. Simpson walked to the car to speak him. Ms. Waddle said that she and the Defendant argued on the telephone on one occasion and that the Defendant said she and Ms. Simpson had fabricated the abuse.

Ms. Waddle testified that on one occasion during Ms. Simpson and the Defendant's marriage, the Defendant drove Ms. Simpson to Ms. Waddle's home, that Ms. Simpson appeared scared, and that Ms. Simpson had been crying. Ms. Waddle stated that the Defendant placed some of Ms. Simpson's property in Ms. Waddle's yard and that the Defendant drove by Ms. Waddle's house a couple of times afterward. Ms. Waddle said that she and Ms. Simpson were scared and that she, Ms. Simpson, Ms.

Simpson's daughter, and Ms. Waddle's daughter left her home at about 3:00 a.m. Ms. Waddle said that they drove to Ms. Waddle's and Ms. Simpson's parents' home in Waterloo, Alabama, and that she drove on backroads because she feared the Defendant followed them.

Lawrence County Sheriff's Department Lieutenant Jimmy Mahar testified that he was the jail administrator, that inmate telephone calls were recorded, and that he retrieved two telephone calls between the Defendant and his parents. Both of the recordings were played for the trial court.

In the first recording, the Defendant spoke with his father. The Defendant asked his father to call the Lawrence County Sheriff to request that the Defendant be moved to a different "pod" in order to watch "games" on television. The Defendant's father responded that he could not tell anyone how to run the jail, and the Defendant stated that he was "suffering." The Defendant's father finally said he would speak with the Sheriff. The Defendant then spoke with his mother. The Defendant stated that he was in the "hole," that he could not watch television, and that he was being discriminated against. The Defendant said that he did not eat lunch because his food was uncooked. The Defendant told his mother to speak with the Sheriff and to request that the Defendant be moved because he was uncomfortable. The Defendant's mother stated that she could not call the Sheriff until Monday. The Defendant told her to call the Sheriff on the weekend.

In the second recording, the Defendant spoke with his mother and father simultaneously. The Defendant told his parents that he was in the "hole" and that he was being discriminated against. The Defendant and his father argued, and the Defendant's father hung up. The Defendant stated that he was finished speaking with his father and told his mother that she needed to contact the Sheriff. The Defendant's mother said that she would call the Sheriff. The Defendant responded that she could call the Sheriff on the weekend, that his weekend was "messed up," and that he did not care to "mess up" everyone else's weekend. The Defendant stated that he did not "deserve" to be in the "hole," that he did not need protection, and that he did not have a problem with anyone. The Defendant's mother said that the Defendant had to give her time to address the problem. The Defendant said to tell the Sheriff he was suffering and to ask the Sheriff whether this was how he "wanted to treat f------ people." The Defendant told his mother to call the Sheriff and to "quit questioning" him.

On cross-examination, Lieutenant Mahar testified that televisions were available for inmates to watch in certain locations in the jail. On redirect examination, Lieutenant Mahar stated that a television was near the Defendant's original location at the jail, that the Defendant was moved because of safety issues, and that the Defendant could only be housed in certain locations because of his conviction.

Upon questioning by the trial court, Lieutenant Mahar testified that the "hole" was a maximum security location in the jail and that inmates were typically on lockdown for twenty-three hours there. Lieutenant Mahar stated that the Defendant was not on lockdown, that the Defendant's door was open, and that the Defendant did not have a television. Lieutenant Mahar said that the Defendant was moved to the "hole" for safety reasons after three inmates threatened the Defendant. Lieutenant Mahar stated that the Defendant requested to be moved to a different jail, that the Sheriff complied with his request, and that the Defendant was no longer incarcerated at the jail.

The Defendant's Good News Bible Study course certificate and his honorable discharge certificate from the Army National Guard were received as exhibits. Letters in support of the Defendant were received as an exhibit. The trial court noted that the letters were also attached to the presentence report and that the court would consider them. A list of the victim's eighteen judgments of conviction were received as a collective exhibit. An autopsy photograph of the victim's left arm was received as an exhibit. The victim's Michigan court case file was received as an exhibit.

The Defendant made an allocution to the trial court. He stated that his actions caused the "unfortunate" death of the victim and had caused him to be incarcerated. He stated that the memory of being unable to place a call to 9-1-1 and help the victim "haunt[ed]" him each day. The Defendant stated that he was sorry for the pain he caused his family and that he could not imagine the "emptiness" he caused the victim's family. He said that the pain he had caused was too much at times and that he prayed for forgiveness. He stated that he had participated in many programs available to him while incarcerated and had earned a certificate in the prison ministry. The Defendant said that the life he thought he would have with the victim was gone and that many lives were changed. The Defendant stated that he would be a productive member of society and that he was sorry.

The trial court considered the evidence presented at the trial and at the sentencing hearing, the presentence report, general principles of sentencing, the nature and characteristics of the criminal conduct involved, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, the Defendant's allocution, and the Defendant's potential for rehabilitation. The court credited the testimony of Ms. Simpson and Ms. Waddle and stated that regardless of Ms. Simpson's confusion about the timeline of events, the court found Ms. Simpson "100 percent credible when she describe[d] the abuse[.]"

The trial court determined that the facts and circumstances surrounding the offense and the nature and circumstances of the criminal conduct were very important. The court found that the trial witnesses stated the victim was covered in blood, nonresponsive, and struggling to breath, that the Defendant told all of the witnesses the victim had cut herself with the machete, and that the Defendant did not help the victim. The court determined

that the Defendant was not a credible witness. The court found that incarceration was necessary to protect society from the Defendant's future criminal conduct and to serve as a deterrent. The court determined that regardless of the Defendant's allocution, the Defendant did not accept responsibility for his actions and that confinement was necessary based on the seriousness of the offense.

The trial court applied mitigating factor (13) because the Defendant served in the Army and National Guard and had no prior convictions. *See* T.C.A. § 40-35-113(13) (2014) ("Any other factor consistent with the purposes of this chapter."). The court also determined that the Defendant was a productive citizen with employment and volunteer history.

The trial court found that enhancement factor (1) applied because the Defendant had a previous history of criminal behavior according to Ms. Simpson's testimony. *See id*. § 40-35-114(1) (2014) (amended 2015, 2016, 2017) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court determined that the victim was "particularly vulnerable" because of her physical disability and applied enhancement factor (4). *See id*. § 40-35-114(4) ("A victim of the offense was particularly vulnerable because of age or physical or mental disability[.]"). The court determined that enhancement factor (5) applied because the Defendant treated with the victim with exceptional cruelty during the offense and did not try to help the victim. *See id*. § 40-35-114(5) ("The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense[.]"). The court stated that it gave great weight to this factor. The court applied enhancement factor (9) because the Defendant used the machete as a deadly weapon. *See id*. § 40-35-114(9) ("The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense[.]"). The court applied enhancement factor (17) and determined that the Defendant intentionally selected the victim because she was a woman. *See id*. § 40-35-114(17) ("The defendant intentionally selected the person against whom the crime was committed . . . because of the defendant's belief or perception regarding the . . . gender of that person[.]"). The court stated that it had never applied enhancement factor (17) and that the court would give it "some" weight. *See id*. The court determined that the Defendant targeted women including the victim, Ms. Simpson, and his mother.

The trial court sentenced the Defendant to twenty-five years' incarceration at 100% service. The court stated that it did not consider the presentence report relative to the Defendant's juvenile conduct and to the two police reports relative to the alleged domestic abuse against the Defendant. The court said that it relied on Ms. Simpson's testimony relative to the alleged domestic abuse. The court denied the Defendant's motion to strike the reports of the Defendant's juvenile conduct and alleged domestic abuse from the information in the presentence report relative to the Defendant's juvenile conduct and to the alleged domestic abuse.

## A. Enhancement Factors

The Defendant contends that he received an excessive sentence because the trial court abused its discretion by applying enhancement factors (4), (5), and (17). The Defendant argues that the court erred by applying enhancement factor (4) because the State did not prove that the victim was vulnerable. *See id*. § 40-35-114(4). The Defendant argues that the court erred by applying enhancement factor (5) because it is typically only applied in cases of abuse or torture and that the facts supporting this factor "must demonstrate a culpability distinct from and appreciably greater than that incident to the crime." *See id*. § 40-35-114(5); *see also State v. Poole*, 945 S.W.2d 93, 98 (Tenn. 1997). The Defendant argues that the court erred by applying enhancement factor (17). *See id*. § 40-35-114(17). The State responds that the court properly applied the enhancement factors and that the court did not abuse its discretion in sentencing the Defendant.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The record reflects that the trial court considered the appropriate purposes and principles of sentencing, including the applicable enhancement factors. The court's determination relative to the victim's vulnerability is supported by the record. *See* T.C.A. § 40-35-114(4) ("A victim of the offense was particularly vulnerable because of age or physical or mental disability[.]"). Application of this enhancement factor is appropriate if

the facts show that the vulnerability of the victim "had some bearing on, or some logical connection to, an inability to resist the crime, summon help, or testify at a later date[.]" *State v. Lewis*, 44 S.W.3d 501 at 505 (Tenn. 2001) (internal citations omitted).  The victim's arm was injured about fifteen or twenty years before the incident after a woman cut the victim's arm with a broken bottle during an altercation.  The victim received surgery to reattach her arm and underwent rehabilitation.  The victim had limited use of her arm and could not cook or drive well because of her arm.  The victim could not extend or bend her arm fully and could not reach behind her head.  Autopsy photographs showed a scar on the victim's upper left arm.  The record reflects that the victim's injury to her arm made her particularly vulnerable and that the injury to the victim's arm had some "logical connection" to the victim's inability to resist the crime.  *See Lewis*, 44 S.W.3d at 505.  The court did not abuse its discretion in applying enhancement factor (4).

Relative to enhancement factor (5), the record reflects that the victim received multiple sharp force injuries to her head, arms, and hands and a five inch laceration to her throat.  *See id*. § 40-35-114(5) ("The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense[.]").  The victim received numerous chop wounds, including one to her left palm that "went through" the victim's left third finger, almost amputated the victim's middle finger, and injured her left first finger.  Dr. Lewis testified that the coloring of some of the victim's wounds led her to conclude the victim received the wounds when the victim had low blood pressure, which could have been caused by blood loss.  The length of the victim's blood trail was 383 feet, and the victim's DNA was found on the broken kitchen knife, machete, shovel, and the Defendant.  The court did not abuse its discretion in applying enhancement factor (5).

The record reflects that the trial court erred by applying enhancement factor (17).  *See id*. § 40-35-114(17) ("The defendant intentionally selected the person against whom the crime was committed . . . because of the defendant's belief or perception regarding the . . . gender of that person[.]").  The court found that the Defendant chose the victim based on her gender and that the Defendant had also chosen targets such as Ms. Simpson and the Defendant's mother because they were women.  We note that no evidence showed that the Defendant's mother was a victim in this case or any other case relative to the Defendant.  The evidence showed that the Defendant was in a romantic relationship with Ms. Simpson when Ms. Simpson was allegedly abused by the Defendant, and the Defendant was engaged to the victim at the time of the incident.  No evidence showed that the Defendant committed the offense against the victim based upon her gender.  The court abused its discretion in applying the enhancement factor (17).

Despite the trial court's misapplication of enhancement factor (17), the record does not reflect that the court wholly departed from the Sentencing Act.  *See Bise*, 380 S.W.3d at 706.  The sentencing range for a Class A felony for a Range I, standard offender is fifteen to twenty-five years.  *See* T.C.A. § 40-35-112(a)(1) (2014).  The Defendant was convicted of a Class A felony and received a twenty-five-year sentence.

The Defendant's sentence was within the appropriate range, and the record reflects that the court properly applied the purposes and principles of the Sentencing Act. The Defendant has not shown an abuse of discretion in the trial court's imposition of a within-range sentence. The Defendant is not entitled to relief on this basis.

## B. Presentence Report

The Defendant contends that the trial court erred by denying his motion to exclude the portions of the presentence report related to alleged domestic abuse and to his juvenile conduct. The State responds that the Defendant has waived appellate review of this issue because he failed to cite to legal authority to support his argument. In the alternative, the State argues that the Defendant was not prejudiced during sentencing because the court did not consider the Defendant's alleged juvenile conduct or the reports related to the domestic abuse when sentencing the Defendant.

The Defendant does not cite to authority to support his argument that the portions of the presentence report related to his juvenile conduct and to alleged domestic abuse should have been excluded. An issue is waived if a defendant fails to support an argument by citing proper authority. *See* Tenn. Ct. Crim. App. R. 10(b). Therefore, appellate review of this issue is waived. We note, though, that the trial court stated that it did not consider the portions of the presentence report related to the alleged domestic abuse and to the Defendant's juvenile conduct when sentencing the Defendant. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE